**Nos. 19-cv-07660; 19-cv-07782; 19-cv-07697 (VB)**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

ESL INVESTMENTS, INC., ET AL., CYRUS CAPITAL PARTNERS, L.P., AND
WILMINGTON TRUST, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE AND
COLLATERAL AGENT

*Appellants,*

– v. –

SEARS HOLDINGS CORPORATION, ET AL.,

*Appellees.*

**ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (DRAIN, J.)**

**IN RE SEARS HOLDINGS CORPORATION, ET AL., CASE NO. 18-23538**

## BRIEF FOR APPELLANTS

| | |
|---|---|
| CLEARY GOTTLIEB STEEN & HAMILTON LLP | WILMER CUTLER PICKERING HALE AND DORR LLP |
| Thomas J. Moloney | Philip D. Anker |
| Sean A. O'Neal | 7 World Trade Center |
| Andrew Weaver | 250 Greenwich Street |
| Katherine R. Lynch | New York, New York 10006 |
| Chelsey Rosenbloom | Tel. (212) 230-8800 |
| One Liberty Plaza | Fax (212) 230-8888 |
| New York, New York 10006 | philip.anker@wilmerhale.com |
| Tel. (212) 225-2000 | |
| Fax (212) 225-3999 | |
| tmoloney@cgsh.com | |

*Attorneys for Appellants ESL Investments, Inc., JPP, LLC, and JPP II, LLC*

MILBANK LLP
Eric R. Reimer (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Robert J. Liubicic
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Tel. (424) 386-4000
Fax (231) 629-5063
tkreller@milbank.com

*Attorneys for Appellant Cyrus Capital Partners, L.P.*


SEYFARTH SHAW LLP
Edward M. Fox
Steven Paradise
Owen Wolfe
620 Eighth Avenue
New York, NY 10018
Tel. (212) 218-4646
Fax (917) 344-1339
emfox@seyfarth.com

*Attorneys for Appellant Wilmington Trust, National Association,
as indenture trustee and collateral agent*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 8012 and 8014(a)(1) of the Federal Rules of Bankruptcy Procedure:

Appellants ESL Investments, Inc., JPP, LLC, and JPP II, LLC (collectively, "ESL"), by and through their undersigned counsel, hereby state:

1. ESL Investments, Inc. has no parent corporation and no public corporation directly or indirectly owns 10% of its stock.

2. JPP, LLC has no parent corporation and no public corporation directly or indirectly owns 10% of its stock.

3. JPP II, LLC identifies ESL Investments, Inc. as a corporation that directly or indirectly owns 10% or more of JPP II, LLC equity interests.

Appellant Cyrus Capital Partners, L.P. ("Cyrus"), by and through its undersigned counsel, hereby states:

Cyrus is a limited partnership and therefore not required to provide a Corporate Disclosure Statement.

Appellant Wilmington Trust, National Association, as indenture trustee and collateral agent ("Wilmington Trust"), by and through its undersigned counsel, hereby states:

Wilmington Trust is not a governmental unit.  Wilmington

Trust is a wholly-owned subsidiary of M&T Bank Corporation,

a publicly held corporation.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................ iii

Table of Contents ..................................................................................... v

Table of Authorities ................................................................................ viii

Statement Regarding Oral Argument ........................................................ 1

Jurisdictional Statement ............................................................................ 1

Statement of Issues Presented ................................................................... 1

Applicable Standard of Review ................................................................. 3

Introduction .............................................................................................. 4

Statement of the Case .............................................................................. 10

I.   The Sears Bankruptcy ...................................................................... 10

    A.  Prepetition Capital Structure ....................................................... 11

    B.  The Provision of Adequate Protection to the Second-Lien Holders .............................................................................. 12

    C.  The Debtors' Spenddown of the Second-Lien Collateral .............................................................................. 14

    D.  The Going-Concern Sale Transaction .......................................... 15

II.  The Rule 3012 Proceeding ............................................................... 18

    A.  The Second-Lien Holders' Evidence ........................................... 18

    B.  The Debtors' Evidence ................................................................ 29

    C.  The Bankruptcy Court's Ruling ................................................... 31

Summary of the Argument ....................................................................... 42

Argument ................................................................................................. 45

I.   The Bankruptcy Court Erred in Not Valuing the Second-
     Lien Collateral At Least At Replacement Cost Based on Its
     Actual Use, As Required by *Rash* ........................................................... 45

     A.   There Is No Legal Basis for the Bankruptcy Court's
          Departure from *Rash* ...................................................................... 48

     B.   The Record Fully Supports Schulte's Valuation of the
          Collateral ........................................................................................ 54

     C.   Alternatively, Even If the Bankruptcy Court's
          Framework Was Consistent with *Rash*, It Erred by
          Rejecting Net Orderly Liquidation Values Higher
          Than 88.7% ...................................................................................... 55

II.  The Bankruptcy Court Erred By Deducting Approximately
     $395 Million from the Second-Lien Holders' Claims Based
     on the Assumption that, in a Hypothetical Liquidation,
     Contingent Stand-by Letters of Credit Would Be Fully
     Drawn ........................................................................................................ 60

III. The Bankruptcy Court Failed to Follow Controlling Second
     Circuit Precedent By Deducting Costs of the Bankruptcy as
     Part of its Valuation Process Despite Ruling that the
     Debtors had Failed to Meet Their Burden of Proof
     Regarding Any Such Requested Surcharges ............................................ 64

IV.  The Bankruptcy Court Failed Properly to Include the Value
     of (A) Ineligible Inventory and (B) Pharmacy Scripts, (C)
     Improperly Deducted Hypothetical Post-Petition Interest on
     the First-Lien Debt, and Failed to Properly Include the
     Value of (D) Credit Card Accounts Receivable, and (E)
     Cash ........................................................................................................... 69

     A.   Ineligible Inventory ......................................................................... 69

     B.   Pharmacy Scripts ............................................................................. 73

     C.   First-Lien Post-Petition Interest ..................................................... 75

     D.   Credit Card Accounts Receivable .................................................... 76

     E.   Cash .................................................................................................. 77

V.  The Bankruptcy Court Erred in Ruling that the Plain Text of
    the APA Creates a $50 Million Cap on ESL's Recovery on
    Account of its Claims Under Section 507(b) of the
    Bankruptcy Code ...................................................................................... 79

Conclusion ...................................................................................................... 84

Certificate of Compliance .............................................................................. 87

Addendum ...................................................................................................... Add.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aerogroup International, Inc.*,
601 B.R. 571 (Bankr. D. Del. 2019)................................................................72

*Aleynikov v. Goldman Sachs Group, Inc.*,
765 F.3d 350 (3d Cir. 2014) ............................................................................84

*Anderson v. City of Bessemer*,
470 U.S. 564 (1985).........................................................................................71

*In re Anderson*,
884 F.3d 382 (2d Cir. 2018) ..............................................................................3

*Associates Commercial Corp. v. Rash*,
520 U.S. 953 (1997)...................................................................................*passim*

*Astra Aktiebolag v. Andrx Pharmaceuticals, Inc. (In re Omeprazole*
*Patent Litig.)*,
222 F. Supp. 2d 423 (S.D.N.Y. 2002) .............................................................25

*In re Blackwood Associates, L.P.*,
153 F.3d 61 (2d Cir. 1998) ........................................................................13, 14

*In re Couture Hotel Corp.*,
536 B.R. 712 (Bankr. N.D. Tex. 2015).............................................................25

*In re Craddock-Terry Shoe Corp.*,
98 B.R. 250 (Bankr. W.D. Va. 1988) ...............................................................51

*U.S. Bank National Association ex rel. CWCapital Asset Management*
*LLC v. Village at Lakeridge, LLC*,
138 S. Ct. 960 (2018).....................................................................................3, 4

*In re Enron Creditors Recovery Corp.*,
370 B.R. 64 (Bankr. S.D.N.Y. 2007)................................................................61

*First Services Group, Inc. v. O'Connell ex rel. Ceron (In re Ceron)*,
412 B.R. 41 (Bankr. E.D.N.Y. 2009) ........................................................*passim*

*General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.)*,
   739 F.2d 73 (2d Cir. 1984) ...............................................................8, 44, 65, 66

*General Electric Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.)*,
   762 F.2d 10 (2d Cir. 1985) .................................................................................8

*In re Greate Bay Hotel & Casino, Inc.*,
   251 B.R. 213 (Bankr. D.N.J. 2000) ...................................................................60

*Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*,
   373 B.R. 283 (Bankr. S.D.N.Y. 2007).................................................................59

*Kuhn Const., Inc. v. Diamond State Port Corp.*,
   990 A.2d 393 (Del. 2010) ..................................................................................82

*In re Lyondell Chemical Co.*,
   585 B.R. 41 (S.D.N.Y. 2018) .............................................................................73

*In re M.D. Moody & Sons, Inc.*,
   2010 Bankr. LEXIS 5220 (Bankr. M.D. Fla. Mar. 5, 2010) ..............................72

*In re Mazzeo*,
   167 F.3d 139 (2d Cir. 1999) ..............................................................................68

*In re Motors Liquidation Co.*,
   482 B.R. 485 (Bankr. S.D.N.Y. 2012).................................................................46

*In re Motors Liquidation Co.*,
   576 B.R. 325 (Bankr. S.D.N.Y. 2017).................................................................52

*Osborn ex rel. Osborn v. Kemp*,
   991 A.2d 1153 (Del. 2010) ................................................................................80

*In re Residential Capital, LLC*,
   501 B.R. 549 (Bankr. S.D.N.Y. 2013)............................................46, 52, 53, 61

*In re Rupprect*,
   161 B.R. 48 (Bankr. D. Neb. 1993) ...................................................................76

*Salamone v. Gorman*,
   106 A.3d 354 (Del. 2014) ..................................................................................80

*In re SK Foods, L.P.*,
    487 B.R. 257 (E.D. Cal. 2013) ............................................................52

*In re Sunnyslope Housing L.P.*,
    859 F.3d 637 (9th Cir. 2017) .....................................................47, 52

*In re T.H.B. Corp.*,
    85 B.R. 192 (Bankr. D. Mass. 1988) ..................................................51

*In re Trim-X, Inc.*,
    695 F.2d 296 (7th Cir. 1982) ............................................................66

*United States v. Sasso*,
    215 F.3d 283 (2d Cir. 2000) ............................................................68

*In re Valenti*,
    105 F.3d 55 (2d Cir. 1997) ............................................................51

*In re Winthrop Old Farm Nurseries, Inc.*,
    50 F.3d 72 (1st Cir. 1995).................................................................51

## Statutes

11 U.S.C. § 363 ...............................................................................5, 13

11 U.S.C. § 363(c)(1)............................................................................53

11 U.S.C. § 363(k) ...............................................................................16

11 U.S.C. § 506(a) ...................................................................45, 52, 64

11 U.S.C. § 506(c) ......................................................................*passim*

11 U.S.C. § 507(b) ......................................................................*passim*

28 U.S.C. § 158(a)(1)..............................................................................1

N.Y. U.C.C. Law § 9-102(a)(64)(A) .....................................................77

## Other Authorities

4 *Collier on Bankruptcy* § 506.04 (16th ed. 2009) ..................................76

Adequate Protection, Norton Bankr. L. & Prac. 3d Dict. of Bankr.
Terms § A50……………………………………………..................13

Eldon H. Reiley, *Credit cards and credit card receivables defined*, 2
Sec. Interests in Pers. Prop. § 32:2 (2018 Westlaw)...........................76

Fed. R. Bankr. P. 703 ........................................................................25

Fed. R. Bankr. P. 3012 ......................................................................18

Fed. R. Bankr. P. 8019 ........................................................................1

James J. White & Robert S. Summers, *Principles of Payment Systems*
521 (2008).....................................................................................61

Peter Ellinger & Dora Neo, *The Law and Practice of Documentary
Letters of Credit* 308 (2010) ...............................................................61

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Rule 8019 of the Federal Rules of Bankruptcy Procedure, ESL, Cyrus, and Wilmington Trust (the "Second-Lien Holders") respectfully request oral argument on this appeal.

## JURISDICTIONAL STATEMENT

This is an appeal from a final order entered by the bankruptcy court on August 9, 2019, determining that the Second-Lien Holders had no super-priority administrative claims under Bankruptcy Code Section 507(b) ("Section 507(b)"). Based on its view of the law, the bankruptcy court concluded that there had been no diminution in the value of the Second-Lien Holders' collateral (the "Second-Lien Collateral") since October 15, 2018, the date Sears filed for bankruptcy and from which the Second-Lien Holders were granted adequate protection (the "Petition Date").  The Second-Lien Holders timely filed notices of appeal on August 14, 2019.  This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES PRESENTED

1.     Did the bankruptcy court err in adopting its own "real world" hypothetical liquidation approach to compute the value of Appellants' collateral on the Petition Date, rather than following the Supreme Court's ruling in *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997), that valuation based on the Debtors' *actual* use of the collateral is the required methodology where, as here,

1

the debtor did not surrender the collateral to the secured creditor but rather used and sold it to generate an income stream and economic value for the debtor and its bankruptcy estate?

2.      Did the bankruptcy court similarly err in deducting approximately $395 million from the value of the Second-Lien Collateral in respect of entirely contingent obligations of Sears to reimburse its first-lien lenders to the extent stand-by letters of credit issued by those lenders were drawn:

(a) despite the fact that (i) no draws had been made under any of those letters of credit, and therefore Sears had no obligations outstanding thereunder, on the Petition Date, (ii) no significant draws under those letters of credit occurred during the bankruptcy case and before Sears sold its operations as a going concern, and (iii) in that sale, the underlying obligations backed by the letters of credit were assumed by the buyer without any further draws on any of the letters of credit; and

(b) based solely on the court's assumption (without any supporting evidence) that, in a hypothetical liquidation (which never occurred), the letters of credit would have been fully drawn and therefore would become due and owing?

3.      Did the bankruptcy court err, in contravention of controlling Second Circuit law, by reducing the value of the Second-Lien Collateral by various

2

indirect overhead costs incurred by Sears during the bankruptcy, despite its ruling that the Debtors had failed to meet their burden of proof regarding any such requested surcharges under Bankruptcy Code Section 506(c)?

4.     Did the bankruptcy court err by not crediting the Second-Lien Holders' Petition Date collateral with the value of cash, pharmacy prescription list collateral, and "ineligible" inventory existing as of the Petition Date and by deducting hypothetical interest expenses of the first-lien lenders that could only accrue after the Petition Date?

5.     Did the bankruptcy court err in ruling that the plain text of the asset purchase agreement under which Sears sold its business operations in bankruptcy limits ESL's recovery on account of its claims under Section 507(b) to $50 million, regardless of the source available to pay such claims?

## APPLICABLE STANDARD OF REVIEW

The standard of review for a bankruptcy court's legal determinations is *de novo*, and the standard of review for a bankruptcy court's findings of fact is clear error.  *In re Anderson*, 884 F.3d 382, 387 (2d Cir. 2018).  "Mixed questions are not all alike . . . [W]hen applying the law involves developing auxiliary legal principles of use in other cases—appellate courts should typically review a decision *de novo*."  *U.S. Bank N.A. ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018).  Even with primarily factual

questions, "an appellate court must correct any legal error infecting a bankruptcy court's decision." *Id.* at 968 n.7.

In this appeal, all the questions concern either pure questions of law or at the least mixed questions of law and fact in which the legal issues predominate. Each question involves the interpretation of a statute (the Bankruptcy Code or the Uniform Commercial Code), and controlling Supreme Court and Second Circuit precedent, or the construction of a contract.

## INTRODUCTION

When Sears filed for bankruptcy on the Petition Date (October 15, 2018), the Second-Lien Holders held the majority of the approximately $1.15 billion in debt secured by a second-priority lien on Sears' inventory, credit card accounts receivable and other collateral, including the proceeds thereof (the "Second-Lien Debt"). That debt was junior to approximately $1.53 billion in first-lien debt secured by the same collateral (the "First-Lien Debt"). As of the Petition Date, that collateral had a "book value"—in essence, the cost Sears incurred to acquire the collateral and therefore to replace it—of approximately $2.95 billion, and a net retail value of $3.07 billion. That was $240 to $388 million more than the amount needed to pay the First- and Second-Lien Debt in full.

Although the automatic stay prevented the Second-Lien Holders from foreclosing on their collateral, the bankruptcy filing also prevented the Debtors

from using any cash collateral, including the proceeds of the collateral securing the Second-Lien Debt, absent consent by the Second-Lien Holders or the provision of "adequate protection."  11 U.S.C. § 363.  Here, the Second-Lien Holders consented in exchange for court-approved adequate protection—essentially, a guarantee that the Second-Lien Holders would be made whole for any diminution, following the Petition Date, in the value of their collateral.

With the approval of the bankruptcy court, those Debtors that were pre-petition obligors of the Second-Lien Debt granted the Second-Lien Holders replacement liens on all of their property, including any new inventory they purchased or accounts receivable they generated, during the bankruptcy case, along with a "super-priority" administrative expense claim if those replacement liens proved insufficient to protect, in full, the value of the Second-Lien Collateral on the Petition Date.

Based upon (and subject to) that agreement, the Debtors proceeded to sell almost all of the collateral that existed on the Petition Date and purchased approximately $1 billion in replacement inventory for their going-concern stores. This enabled the Debtors to repay the First-Lien Debt, to fund the enormous costs of the chapter 11 cases—including more than $213.4 million in professional fees— and ultimately to satisfy the condition for the going-concern sale of their business

that closed some four months after the Petition Date: that they deliver to the buyer at least $1.6 billion of inventory and receivables.

The buyer in that going-concern sale, approved by the bankruptcy court, was a newly-created affiliate of ESL. As part of the consideration paid for the going-concern business, ESL organized a "credit bid" of $433.5 million in Second-Lien Debt, in which Cyrus and certain other second-lien claimants were required to take part. As a result of the credit bid and the buyer's assumption of certain of the Debtors' loans under which Cyrus was the lender, upon closing of the sale, Cyrus received a small minority equity interest in the buyer and also became a lender to the buyer. Because the sale did not otherwise result in the payment of any of the remaining $718 million of the $1.15 billion of Second-Lien Debt, the Second-Lien Holders asserted their rights to any remaining post-sale collateral, as well as a super-priority claim, as expressly bargained and provided for under the terms of the court-approved adequate-protection package.

But the Debtors disputed that claim in its entirety, arguing that the Second-Lien Holders' liens had minimal value at the Petition Date and that this modest value had been satisfied through the $433.5 million "credit bid" or should be deemed to have been exhausted by a "surcharge" on the collateral for substantially all of the expenses the Debtors had incurred during the bankruptcy leading up to the going-concern sale.

6

The parties proceeded to trial to determine the loss in value of the Second-Lien Collateral since the Petition Date.  The bankruptcy court requested a streamlined factual hearing, recognizing that because the sale of the assets had already occurred, "[w]e actually have the facts."  *See* A-4207 (22:2-21).[1] Following a short, two-day trial (held on an expedited basis at the Debtors' insistence), the bankruptcy court held that there had been no diminution in value, because it concluded that the Second-Lien Holders had realized more for their collateral through their credit bid—the only bid to acquire Sears as a going concern that any party made—than the collateral had been worth on the Petition Date.  In reaching that conclusion, the bankruptcy court made several critical legal errors.

*First*, rather than acknowledge the Debtors' actual use of the collateral and apply at least the "replacement value" standard mandated by *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997), the bankruptcy court applied a hypothetical liquidation valuation, which valued the collateral at hundreds of millions of dollars less than its actual replacement cost—even though no such liquidation actually occurred for the bulk of the collateral in question.  The bankruptcy court compounded this error by applying a starting "net orderly liquidation value" ("NOLV") of 88.7% (which it reduced further, as discussed

---

[1] References to "A-" herein are citations to the Common Appendix for Appellants, filed contemporaneously herewith, pursuant to Rules 8015 and 8018 of the Federal Rules of Bankruptcy Procedure.

below) to the already undervalued inventory, while also ignoring substantial unrebutted evidence, including the Debtors' own analyses, showing that—even if NOLV was the right legal test (and it was not under *Rash*)—the NOLV was materially higher.

*Second*, using the same hypothetical liquidation valuation approach, the bankruptcy court concluded that approximately $395 million in contingent first-lien obligations in the form of stand-by letters of credit would have been drawn in a liquidation (that never occurred) and thus should reduce the value of Second-Lien Collateral by their full face amount before determining the Petition Date value of the Second-Lien Holders' interest in the collateral, even though none of the letters of credit had been drawn as of the Petition Date (and only a minimal amount was drawn thereafter).

*Third*, the bankruptcy court further discounted the Second-Lien Collateral value by "surcharging" the collateral for expenses the Debtors purportedly incurred in maintaining that collateral, contrary to both: (a) the Second Circuit's rulings in *General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.)*, 739 F.2d 73 (2d Cir. 1984) ("*Flagstaff I*"), and *General Electric Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.)*, 762 F.2d 10 (2d Cir. 1985) ("*Flagstaff II*"); and (b) the court's own conclusion that the Debtors had not met

8

their burden to impose *any* surcharge under Bankruptcy Code Section 506(c)

("Section 506(c)").

*Fourth*, the bankruptcy court further erred by excluding from the value of

Second-Lien Holders' Petition Date collateral the value of cash proceeds,

pharmacy prescription list ("Scripts") collateral, and "ineligible" inventory—all of

which were collateral under the terms of the relevant security agreement—and also

by deducting hypothetical post-petition interest on the First-Lien Debt that had not

accrued as of the Petition Date.

*Finally*, the bankruptcy court incorrectly construed the asset purchase

agreement for the going-concern sale to bar ESL from asserting a Section 507(b)

claim for more than $50 million.

These were errors of law. They turned on the bankruptcy court's improper

interpretation of the Bankruptcy Code, controlling precedent, and the terms of the

parties' governing agreements. The facts were almost entirely undisputed, and the

Debtors presented no expert testimony whatsoever in support of their valuation

thesis or their proposed surcharges. The bankruptcy court nonetheless crafted its

own valuation test and standard for surcharges, divorced from controlling Supreme

Court and Second Circuit precedent, ignored even the Debtors' own assertions and

admissions, and largely did not credit the expert valuation testimony presented on

behalf of the Second-Lien Holders, predominantly on the ground that the experts had supposedly not been properly instructed on the law.  A-4790-91 (230:5-31:11).

The bankruptcy court's decision should be reversed.

## STATEMENT OF THE CASE

## I.    THE SEARS BANKRUPTCY

Sears has been one of America's most iconic retailers.  Over the course of its 125-year history, Sears transformed from a mail-order catalog to a ubiquitous presence in American shopping malls.  *See* A-4 (Riecker Declaration ¶ 7).  In recent years, however, Sears faced significant difficulties in a highly competitive market dominated by online retailers.  A-5-6.  As its financial performance declined, Sears contracted in size, including through individual store going-out-of-business sales ("GOB Sales"), and borrowed substantial funds to generate the liquidity it needed.  *Id.*  Sears' largest secured creditor was ESL, which provided financing and support that "ensured that the Company's doors remain open."  *Id.*

Ultimately, however, Sears' board of directors concluded that Sears could not "right size" into a viable company without the help of Chapter 11.  On the Petition Date, each of the Debtors filed a voluntary petition for relief with the bankruptcy court.  In their first-day papers, the Debtors described the filing as presenting "an opportunity for Sears to once again transform its business and to position itself for success in the twenty-first century," and stated that they "hope[d]

that the Company will emerge from these Chapter 11 Cases, whether pursuant to a chapter 11 plan of reorganization or a successful sale process, as a streamlined—and profitable—version of itself." A-9-10.

The Debtors explained that they saw "a viable path forward for a reorganization around a smaller footprint of profitable stores," specifically, "[a]pproximately 400" successful "four-wall EBITDA positive" stores that could potentially be sold "as a going concern." A-8. The Debtors also identified 142 stores "that operate at significant losses" and stated their plan to "conduct going-out-of-business sales with respect to those stores as efficiently as possible to access much-needed liquidity." A-9.

## A.     Prepetition Capital Structure

On the Petition Date, "nearly all of the Company's assets [were] encumbered." A-38. The secured debt totaled approximately $2.68 billion, comprised of approximately $1.53 billion in First-Lien Debt secured by the Debtors' most liquid assets—primarily inventory and receivables—and approximately $1.15 billion in Second-Lien Debt, secured on a junior basis by substantially the same assets, the Second-Lien Collateral. A-19-35, 38 (Riecker Declaration ¶¶ 34, 40); A-2445; A-2725.

The book value of the inventory and receivables securing both the First- and Second-Lien Debt on the Petition Date was $2.69 billion, *see* A-1834 (Griffith

11

Declaration ¶ 20); A-19-35, 38 (Riecker Declaration ¶¶ 34, 40), with a selling value of over $5 billion.  A-3460.  Additionally, there was cash collateral in the amount of $115.5 million, and credit card and pharmacy receivables and Scripts with an aggregate value of $148.9 million.  *See* A-2887-88 (Schulte Report).

Thus, as of the Petition Date, the book value of the collateral was more than sufficient to cover the Second-Lien Debt.  Indeed, the Debtors confirmed at the outset of their bankruptcy cases that on the Petition Date, the book value of the Second-Lien Collateral well exceeded the First-Lien Debt.  *See* A-407-08 (Riecker Declaration ¶ 8).

ESL and Cyrus held the majority of the Second-Lien Debt for which Wilmington Trust serves as collateral agent.[2]

## B.    The Provision of Adequate Protection to the Second-Lien Holders

The chapter 11 filing triggered an "automatic stay," which prevented the Second-Lien Holders from foreclosing on their collateral without the bankruptcy court's permission.  But, as a matter of law, the bankruptcy filing also prevented the Debtors from continuing to use cash collateral, including the cash proceeds derived from the Second-Lien Collateral, without obtaining the Second-Lien

---

[2] Wilmington Trust also serves as indenture trustee for the 6-5/8% Senior Secured Notes due 2018 (the "2018 Notes") which were outstanding in the principal amount of $89,002,000 as of the Petition Date, none of which is held by ESL or Cyrus.  A-2443 *et seq*.

Holders' consent or providing them with court-approved "adequate protection." *See* 11 U.S.C. § 363.

Adequate protection is a fundamental right of secured creditors in bankruptcy proceedings; it ensures that the value of a secured creditor's collateral is "maintained at all times" from and after the Petition Date. Adequate Protection, Norton Bankr. L. & Prac. 3d Dict. of Bankr. Terms § A50 (citations omitted). The Bankruptcy Code "deliberately protects and preserves the interests of secured creditors in property in which they have a security interest, and accordingly takes the concept of adequate protection very seriously." *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 68 (2d Cir. 1998).

Here, the Debtors and the Second-Lien Holders agreed on a standard type of adequate protection in exchange for the Second-Lien Holders' consent to the Debtors' continued use of their collateral over the course of the bankruptcy proceedings. The Debtors requested this protection in their filings on the Petition Date, A-174, and the bankruptcy court approved the request on a final basis following notice to all other parties in interest, *see* A-231 (Interim DIP Order); A-412 (the "Final DIP Order").

Specifically, beginning on the Petition Date, the Second-Lien Holders were granted replacement liens on all of the property of the Debtors that were pre-petition obligors on the Second-Lien Debt, including on any new inventory those

Debtors purchased (and any new receivables they generated) post-petition, as well as super-priority administrative claims under Bankruptcy Code Section 507(b) to the extent those replacement liens proved insufficient to maintain the full value of the Second-Lien Collateral as of the Petition Date.  *See* A-460-62, A-464-65 (Final DIP Order ¶¶ 17(d), 18(d)).  Those super-priority administrative claims flow as a matter of law from the terms of the Bankruptcy Code.  Section 507(b) provides "that a secured creditor has super-priority for a claim in the amount that the debtor's use of the collateral during the time of the stay [*i.e.*, from and after the Petition Date] diminished the value of the collateral."  *In re Blackwood Assocs.*, 153 F.3d at 68.  That claim "ha[s] priority over every other claim allowable under [Section 507]," 11 U.S.C. § 507(b), including all administrative expense claims allowed under Section 507(a)(2).

### C.    The Debtors' Spenddown of the Second-Lien Collateral

The Debtors agreed to the Final DIP Order, rather than simply surrender the collateral, so that they could use that collateral to maintain their ongoing business, fund their chapter 11 proceeding, and generate income that would support either their reorganization or the going-concern sale that they contemplated from the outset of the bankruptcy cases.  *See* A-227 (Meghji Declaration ¶ 10).  Subject to the Final DIP Order, the Debtors continued to sell their inventory to consumers during the bankruptcy, mostly at "Go-Forward" stores and also at some GOB

Stores, and to collect accounts receivable. *See* A-4215-17 (111:23-113:11). The inventory sales and collection of receivables during the cases generated over $3.3 billion in revenues for the Debtors, all of which was Second-Lien Collateral. A-2363; A-3501 *et seq.*; A-3499.

The Debtors used the proceeds to, among other things, pay down a significant portion of the First-Lien Debt (and ultimately to satisfy the rest of it from the proceeds of the going-concern sale) and purchase approximately $1 billion in new inventory. A-2061; A-3501-04. In addition, the Debtors used the proceeds to fund the bankruptcy case in its entirety, including supporting businesses and assets wholly unrelated to the Second-Lien Collateral, paying administrative expenses that ranked junior to the Section 507(b) claims of the Second-Lien Holders, and pursuing numerous workstreams having nothing to do with preserving the value of the Second-Lien Collateral. These expenses paid by the Debtors from the proceeds of the Second-Lien Collateral included $213.4 million in fees paid to counsel and other professionals. *See* A-4366 (139:7-14).

As a result, as the bankruptcy proceedings continued, the amount of Second-Lien Collateral dwindled. *See id.*

### D.    The Going-Concern Sale Transaction

The Debtors and their financial and legal advisors evaluated several options for restructuring before "determin[ing] that a single, going-concern transaction for

all or substantially all of the Debtors' businesses provided the best opportunity to maximize value for the Debtors, preserve jobs, and mitigate the creation of additional claims against the Debtors." A-1241 (Aebersold Declaration ¶ 11). Ultimately, a newly-created ESL affiliate, Transform Holdco LLC ("Transform"), submitted the only bid to purchase substantially all of the Debtors' assets as a going concern. A-1243. On January 18, 2019, the Debtors determined that the offer submitted by Transform was "the highest or best offer" and filed a copy of the executed asset purchase agreement (the "APA"). *See* A-953 (Notice of Successful Bidder). After a contested hearing in which the bankruptcy court heard extensive testimony and reviewed substantial evidence regarding the benefits and downsides of the proposed going-concern sale, the bankruptcy court approved the sale (the "Sale Transaction"). It closed on February 11, 2019.

Transform's winning bid for substantially all of the Debtors' assets provided the Debtors with approximately $5.2 billion in aggregate value. As set forth in Section 3.1 of the APA, the purchase price was not allocated among individual assets and included, *inter alia*, cash paid to the Debtors, a "credit bid" pursuant to Section 363(k) of the Bankruptcy Code of Second-Lien Debt in the amount of $433,450,000 (the "Credit Bid"), and the assumption or satisfaction of significant liabilities of the Debtors. A-1012-14. The Sale Transaction resulted in the payment in full of all of the outstanding First-Lien Debt. The Credit Bid, in which

16

Cyrus and certain other second-lien claimants were required to take part, reduced

the amount of outstanding Second-Lien Debt on a dollar-for-dollar basis,[3] leaving

approximately $718 million in Second-Lien Debt outstanding.[4]  The Debtors sold

all of their remaining inventory to Transform in the Sale Transaction, which

(reflecting the Debtors' use of much of the inventory during the bankruptcy case),

when combined with purchased receivables, had a book value at closing of only

approximately $1.67 billion—substantially less than had existed on the Petition

Date.  *See* A-1634 (APA § 10.9).

Because the Sale Transaction left $718 million of Second-Lien Debt unpaid,

the Second-Lien Holders asserted their lien rights and super-priority claims under

Bankruptcy Code Section 507(b) ("Section 507(b) Claims"), in accordance with

the Final DIP Order.  Under the terms of the APA, however, ESL agreed that its

allowed Section 507(b) Claims would not extend to the proceeds of litigation

against ESL itself for supposed intentional misconduct, and also agreed to limit its

ability to recover proceeds from other litigation claims pursued by the Debtors to

$50 million.  *See* A-1628-29 (APA § 9.13(c)); A-1772 (APA, Ex. G).  ESL did not

otherwise agree to restrict its second-lien rights and its Section 507(b) Claims

---

[3] Holders of the 2018 Notes did not receive any value from the Credit Bid.

[4] As a result of the credit bid and the buyer's assumption of certain of the Debtors' loans under which Cyrus was the lender, upon closing of the sale, Cyrus received a small minority equity interest in the buyer and also became a lender to the buyer.

recoveries in any other way.  Cyrus's and Wilmington Trust's second-lien rights were not restricted at all.

## II.   THE RULE 3012 PROCEEDING

On May 26, 2019, the Debtors filed a motion to estimate the Second-Lien Holders' claims.  A-1787 ("Estimation Motion").  The parties subsequently stipulated to convert the Estimation Motion into a proceeding under Bankruptcy Rule 3012 to: (a) determine the amount of the Second-Lien Holders' secured claims and Section 507(b) Claims; and (b) adjudicate the Debtors' request, pursuant to Section 506(c), to surcharge the Second-Lien Collateral with substantially all the costs of the bankruptcy proceedings.  *See* A-1839 (the "507(b) Stipulation").  The bankruptcy court so-ordered the 507(b) Stipulation, and the parties proceeded with an expedited briefing schedule and trial in which the court heard testimony from three expert witnesses for the Second-Lien Holders and two fact witnesses for the Debtors.  *See* A-2036.

### A.   The Second-Lien Holders' Evidence

The expert witnesses engaged by ESL, Wilmington Trust, and Cyrus, working independently, all opined that the Second-Lien Holders had substantial Section 507(b) Claims.  A-2879 (Schulte Report); A-3099 (Henrich Report); A-1963 (Murray Report).

1.     *David Schulte*

ESL's expert, David M. Schulte ("<u>Schulte</u>"), testified that the Second-Lien

Debt was over-secured on the Petition Date (*i.e.*, the collateral was worth more

than the debt), something that was evident from the collateral's book value.  *See* A-

2861 (Schulte Declaration); A-2879 (Schulte Report).  Specifically, Schulte

calculated that after allowing for payment of the First-Lien Debt, the value of the

Second-Lien Collateral securing the $1.151 billion in Second-Lien Debt was

approximately $1.4 billion on the Petition Date.  A-2864-65 (Schulte Declaration ¶

11).  Schulte accordingly concluded that the Second-Lien Holders were entitled to

a Section 507(b) Claim equal to the full value of the $718 million in Second-Lien

Debt that remained outstanding after application of the $433.5 million Credit Bid

in the Sale (minus whatever remaining collateral value was available to satisfy the

Second-Lien Holders' adequate protection liens).  *Id*.

Schulte arrived at his Petition-Date value of the collateral by following the

Supreme Court's instructions in *Rash* that valuation of a secured creditor's

collateral in the hands of a debtor must be determined based on the debtor's use of

that collateral.  Pursuant to *Rash*, collateral that the debtor retains and uses must be

valued at least at replacement cost, while collateral that the debtor surrenders to the

creditor is valued at its foreclosure value.  520 U.S. at 962*.*

Accordingly, Schulte applied a two-part analysis to value the inventory collateral according to its actual use by Sears during the bankruptcy cases. *See* A-2888 (Schulte Report). For the inventory that Sears sold in Go-Forward stores, Schulte used its book value, which in a retail business in which inventory is constantly replaced, like Sears, closely approximates the inventory's replacement cost. A-2889-90. For the inventory sold in the GOB Stores, which can arguably be equated to a foreclosure sale, Schulte used the actual value that Sears achieved in those sales (after deducting store-level costs), which was slightly lower than book value. *Id*. at 2890-91. For the non-inventory collateral of cash, credit card receivables, pharmacy receivables, and Scripts, Schulte used the values provided by the Debtors themselves from their own records. A-2887-88.

2.     *William Henrich*

Wilmington Trust submitted expert testimony from William Henrich ("Henrich"). In keeping with *Rash's* command that "actual use, rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the property's 'disposition or use,'" *Rash*, 520 U.S. at 963, Henrich based his valuation on the Debtors' actual use of the inventory collateral, which, as described above, was sold at retail in the Go-Forward Stores or the GOB Stores. A-3072, 3074-81 (Henrich Declaration).

Henrich determined that there had been $1.96 billion of inventory at cost at the Debtors' Go-Forward Stores.  A-3080.  Henrich further concluded that the inventory at the Go-Forward Stores had been sold at a 29% gross margin, based upon the Debtors' own projections.  A-3087.  Applying the 29% gross margin, Henrich determined that the Go-Forward Store inventory had a value of $2.7592 billion.  A-3080.  From that amount, Henrich deducted $457.2 million for store expenses, resulting in a total of $2.302 billion in inventory value at the Go-Forward Stores, net of store expenses, on the Petition Date.  A-3080, A-3126.

With respect to inventory sales in the GOB Stores, Henrich determined that the Debtors had held $617.2 million in inventory at those stores.  A-3076, A-3126. Henrich then examined the actual sales results at the GOB Stores and determined that the Debtors had recovered 96.4% of the cost of the inventory, net of all store expenses, leaving $22.4 million in unrecovered value from the inventory.  A-3076. Accordingly, after subtracting the $22.4 million in unrecovered value from the total $617.2 million in GOB Store inventory, Henrich concluded that the Debtors had realized $594.8 million from the sale of inventory at the GOB Stores.  A-3073, A-3126.

Based on his analysis, Henrich concluded that the aggregate value as of the Petition Date of the collateral securing both the Debtors' First-Lien Debt and the Second-Lien Debt totaled $3.2792 billion.  A-3126.  That total consisted of cash of

21

$116.2 million,[5] $78.8 million in total accounts receivable, total inventory of $3.0114 billion, which consisted of $2.7592 billion in Go-Forward Store inventory sale proceeds (net of expenses from the Go-Forward Stores of $457.2 million), $594.8 million of GOB Store liquidation inventory value (net of expenses), and Scripts with an asset value of $72.8 million.  *Id.*  Henrich included in his analysis inventory that was deemed "ineligible" by the lenders of the First-Lien Debt (the "First-Lien Lenders") for purposes of establishing reserves because that inventory, though "ineligible" under the First-Lien Lenders' loan agreement, still had value. A-3080.  Henrich also incorporated into his analysis corporate overhead and store expenses, such that Henrich's collateral value as of the Petition Date was $3.0711 billion, net of expenses.  A-3079-81, A-3126.

Henrich further concluded, based upon the Debtors' court filings and records, that the Debtors' outstanding First-Lien and Second-Lien Debt as of the Petition Date totaled $2.6833 billion.  A-3127.  In calculating the outstanding First-Lien Debt, Henrich determined that pre-petition stand-by letters of credit to which the Debtors were a party totaling $394.9 million should not be included in the outstanding First-Lien Debt because the stand-by letters of credit had not been

---

[5] Cash was part of the Second-Lien Collateral to the extent it was proceeds from the sale of inventory.  To the extent it was not, it would nevertheless benefit the Second-Lien Holders by reducing the amount of outstanding First-Lien Debt secured by the collateral.  A-3073, 3075, 3083-84.

drawn as of the Petition Date, and the Debtors accordingly had no repayment

obligations under them as of the Petition Date.  A-3072, 3081-82, 3084-85.

Henrich's conclusion that the stand-by letters of credit should not be included in

the Debtors' First-Lien Debt was confirmed by the fact that there were only

relatively minimal draws on them after the Petition Date.  A-3081; A-3202

(showing draws of only $9.1 million after the Petition Date).

Based upon the foregoing, Henrich concluded that the value of the collateral

as of the Petition Date exceeded the amount needed for the Debtors to repay the

First-Lien and Second-Lien Debt in full.  A-3073, 3087-88, 3092.  Henrich

therefore determined that the Second-Lien Holders had a Section 507(b) Claim for

the full $718 million, just as Schulte had concluded.

### 3.    *Marti Murray*

Cyrus's expert, Marti Murray ("Murray"), did not seek to determine the

retail cost, replacement cost, or any other going-concern value of the collateral.

Rather, she set forth a conservative "Minimum Case" designed to establish the

amount Sears "could likely have achieved" if "the collateral would have been

liquidated through company-wide GOB Sales"—*i.e.*, through an orderly

liquidation rather than a going-concern sale, based upon facts known or knowable

as of the Petition Date and excluding any collateral not eligible for borrowing

under the First-Lien Lenders' borrowing base and by discounting the value of

eligible collateral based on the borrowing base's advance rates.  A-1991 (Murray Report).

Murray relied on appraisals performed by Tiger Capital Group ("Tiger"), an independent third-party appraiser that was previously hired by the First-Lien Lenders to appraise the value of Sears inventory.  Tiger's appraisals were based on information provided by the Debtors themselves.  *See* A-3364 (describing management interviews), A-3416-17 (describing information the Debtors provided to Tiger).  Moreover, the Debtors themselves relied on Tiger data during the bankruptcy proceedings.  *See* A-4429-30, 4435-36 (202:15-203:5, 208:25-209:10); A-3533 (Debtors' bid analysis relying on Tiger data).  Tiger ascribed an overall NOLV of 88.7%, which reflected the value of the inventory net of all costs necessary to sell the inventory in an orderly liquidation process, to Sears' net eligible inventory in its Inventory Appraisal dated September 28, 2018.  *See* A-2968 (Murray Declaration ¶ 7).  Tiger ascribed an NOLV of 51.6%-55.8% to in-transit inventory (inventory that had been shipped by a supplier but not yet received by Sears) in its appraisal dated February 4, 2019.  *Id*.; A-3545.  The Debtors never suggested to Tiger that its valuations were too aggressive.  *See*

A-4432 (205:6-9).  To the contrary, before the bankruptcy filing, the Debtors told

Tiger it was being too *conservative*.  A-4430 (203:13-19).[6]

Using this "Minimum Case" methodology, Murray found that the Second-

Lien Holders suffered a diminution in value from the Petition Date to the effective

date of a plan of confirmation of *at least* $491.6 million.  *See* A-2968-69 (Murray

Declaration ¶ 8).  Murray explained that this Minimum Case was conservative,

because (among other reasons) Tiger's appraisals were prepared for lenders, and

because they represented what a Tiger affiliate would be willing to guarantee.  A-

2969-70.  As an example of Tiger's conservatism, Murray noted that while Tiger

ascribed zero value to ineligible inventory (other than in-transit inventory), that

inventory still had value.  *Id*.; A-3545.

---

[6] At the trial, the bankruptcy court raised a question about Murray's reliance on the Tiger reports and appraisals.  *See* A-4245 (18:3-7).  But Murray testified that it is standard for valuation experts to rely on materials created by specialists such as Tiger, particularly when the assets being valued no longer exist in the same form. *See* A-4355-56 (128:17-129:10).  Murray's reliance on Tiger was appropriate, just as it was appropriate for the Debtors to have relied on Tiger before and during the bankruptcy.  *See* A-4356-57 (129:11-130:1).  *See, e.g.*, *Astra Aktiebolag v. Andrx Pharms., Inc. (In re Omeprazole Patent Litig.)*, 222 F. Supp. 2d 423, 491 (S.D.N.Y. 2002) (appropriate for expert to rely on another expert's reports because Rule 703 allows expert to rely on facts or data "of a type reasonably relied upon by experts in the particular field, including facts, data, and opinions that are otherwise inadmissible"); *In re Couture Hotel Corp.*, 536 B.R. 712, 725–27 (Bankr. N.D. Tex. 2015) (appropriate for valuation expert to rely upon charts and data from third-parties because such reliance is "clearly contemplated" by Rule 703 and "there was no objection that the information . . . was not the type reasonably relied upon by experts in his field").

Indeed, the record established that Murray's valuation represented a rock-bottom minimum.  Murray set forth various alternative indications of value that were higher than Tiger's 88.7% NOLV:

- The November 23, 2018 Declaration of Robert A. Riecker, the Debtors' CFO, confirmed that, around the Petition Date, "the net orderly liquidation value ('NOLV') of Debtors' inventory was valued at about $2.74 billion" by the Debtors themselves.  *See* A-2972-73 (Murray Declaration ¶ 11(e)); A-407-08 (Riecker Declaration ¶ 8).  Accepting the Debtors' $2.74 billion NOLV for the Petition Date inventory would have resulted in a Section 507(b) Claim for the Second-Lien Holders of $1.036 billion or, after taking account of the Second-Lien Holders' credit bid, the full remaining unpaid Second-Lien Debt of $718 million.  *See* A-2972-73 (Murray Declaration ¶ 11(e)).

- A January 14, 2019 Wind Down Analysis prepared by the Debtors' Chief Restructuring Officer Mohsin Meghji indicated that Debtors believed that the NOLV of the inventory at that time was approximately 90%, after taking into account selling costs.  *See* A-2968 (Murray Declaration ¶ 7); A-3963 (Wind Down Analysis).  Applying a 90% NOLV to Murray's Minimum Case analysis (rather than 88.7%) would have resulted in a Section 507(b)

Claim of $523 million.  *See* A-2971, A-3061 (Murray Declaration ¶ 11(b), Ex. B).

- A January 11, 2019 Unsecured Creditor's Committee ("UCC") presentation prepared in connection with the UCC's opposition to the Sale Transaction was founded on an assumption that in a liquidation the Debtors would achieve NOLVs of approximately 90% net of liquidation costs, with potential upside beyond that.  *See* A-2971 (Murray Declaration ¶ 11(b)); A-3873-78.  As noted above, applying a 90% NOLV to the Minimum Case analysis would have resulted in a Section 507(b) Claim of $523 million.  *See* A-2971, A-3061 (Murray Declaration ¶ 11(b), Ex. B).

- In December 2018, Abacus Advisors Group L.L.C. ("Abacus"), in its capacity as the Debtors' inventory liquidation agent prior to and during the bankruptcy, indicated that in an orderly liquidation the Debtors would likely recover between 90.1% and 93.1% of the cost of inventory, net of selling costs.  *See* A-2968 (Murray Declaration ¶ 7); A-3872.  Abacus' views carried significant weight.  Abacus had extensive real-world experience liquidating Sears inventory; since 2006, Abacus had liquidated 1,950 Sears stores, and it liquidated over 200 Sears stores during the bankruptcy case. *See* A-4433-34 (206:13-207:3); A-3860.  Applying Abacus's mid-point of 91.6% to Murray's Minimum Case analysis (rather than 88.7%) would have

resulted in a Section 507(b) Claim of $561 million.  *See* A-2971-72, 3063 (Murray Declaration ¶ 11(c), Ex. C).  Applying Abacus's high end of 93.1% would have resulted in a Section 507(b) Claim of $597 million.  *See* A-2971-72, 3065 (Murray Declaration ¶ 11(c), Ex. D).

- An analysis prepared for the benefit of the Sears Restructuring Committee for presentation on January 5, 2019, indicated that the expected net recoveries on the Debtors' inventory, based on liquidation proposals from four different third-party liquidators, ranged from 89.4% to 91.7% of cost, net of operating expenses and agent fees.  *See* A-2972 (Murray Declaration ¶ 11(d)); A-3881.  The liquidators and their expected net recoveries were (1) a Hilco/Gordon Brothers joint venture (89.7%), (2) a Tiger/Great American joint venture (89.4%), (3) SB360 (91.5%), and (4) Abacus (91.7%).  *See* A-2972 (Murray Declaration ¶ 11(d))*.*  Each of these four recovery percentages would have yielded a Section 507(b) Claim significantly larger than the Minimum Case.  *Id.*

In short, even under her conservative "Minimum Case" approach, Murray concluded that the Second-Lien Holders' interest in the collateral on the Petition Date totaled between $925 million and $1.469 billion, substantially more than the $433.5 million realized through the Credit Bid some four months later.  A-2002-04.

### B.    The Debtors' Evidence

The Debtors acknowledged that "the most appropriate (and yet conservative) methodology to value any Section 507(b) Claim under these circumstances is the fair market value of the Collateral in the hands of the Debtors at the Petition Date." *See* A-2102-03 (Debtors' Opposition).  But they then nonetheless chose to ignore the Debtors' sale of billions of dollars of inventory at retail between the Petition Date and the date of the Sale Transaction.  A-4221 (256:7-12); A-3501 *et seq.*; A-3499.  And they also chose to offer no expert testimony to rebut the Second-Lien Holders' experts.  Instead, the Debtors relied solely on their assertion that the only relevant valuation information was an unsupported extrapolation from the Sale Transaction that occurred four months after the Petition Date.

Specifically, the Debtors offered only two purported fact witnesses, one of whom said that he had no opinion whatsoever on the value of the Second-Lien Collateral at the Petition Date.  *See* A-4227 (12:3-24).  The other, Brian Griffith ("Griffith"), offered a lay opinion that all of the inventory (including both so-called "eligible" and "ineligible" inventory) was worth on the Petition Date only 85% of its book value.  Griffith based this "opinion" exclusively on his assertion that, under the APA, Transform had paid 85% of book value for the remaining $1.657 billion of collateral.  As discussed below, the bankruptcy court rejected this argument because the APA does not so provide.  *See* A-2829-30 (Second

Supplemental Griffith Declaration ¶¶ 5-6).  Griffith then used this fictional 85%

valuation—supposedly based on the Sale Transaction, which occurred on February

11, 2019 in the dead of winter—as a "proxy," A-4221 (256:13-25), for the value of

the inventory months earlier, at the Petition Date on October 15, 2018, at the

beginning of the highly profitable Christmas shopping season.

Griffith, although not a lawyer, also purported to opine that cash proceeds,

pharmacy receivables, and Scripts were not Second-Lien Collateral; that the full

face amount of $395 million in stand-by letters of credit issued by the First-Lien

Lenders should be deducted from the value of the Second-Lien Collateral, even

though those letters of credit were undrawn on the Petition Date, were only likely

to be drawn (if at all) if there was a liquidation, and in fact were never drawn in

any material amounts during the bankruptcy cases; and that another $34 million

should be deducted from the Petition Date valuation of the Second-Lien Collateral

for hypothetical interest on the First-Lien Debt that could have accrued only after

that date.  *See* A-2834-39.

Finally, the Debtors asserted that the bankruptcy court should burden the

Second-Lien Collateral with an unprecedented $1.4 billion surcharge—which

consists of virtually ***all*** the costs of the bankruptcy proceedings, as well as the costs

of running the entire enterprise during the bankruptcy case—pursuant to

Bankruptcy Code Section 506(c).  Section 506(c) allows a bankruptcy estate to

"recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property," but only "to the extent of any benefit to the holder of such claim."  11 U.S.C. § 506(c).

### C.  The Bankruptcy Court's Ruling

On July 31, 2019, following two full days of trial, the bankruptcy court ruled from the bench.  The court purported to apply its own net orderly liquidation analysis of the value of the collateral, contrary to the position of all of the parties, ***including the Debtors,***[7] that this was not the correct way to value the property used and sold by the Debtors in a going-concern transaction—and despite the fact that nothing resembling a foreclosure sale actually occurred other than for inventory liquidated through GOB Sales.

Based on this approach, the bankruptcy court concluded that the value of the collateral securing the $1.15 billion Second-Lien Debt at the Petition Date was only $186.6 million.  *See* A-3208-09 (the "507(b) Order").  Because the Second-Lien Holders had recovered almost $250 million more in value through their $433.5 million Credit Bid, the bankruptcy court concluded that they were not entitled to any further recovery on account of their Section 507(b) Claims.  *Id.*

---

[7] *See* A-1810 (Debtors' Estimation Motion ¶ 37) ("Importantly, other fair-market or liquidation methodologies—including [NOLV]—are not appropriate under circumstances when, as here, the Debtors contemplated a going concern sale as of the Petition Date.").

1.     *The Bankruptcy Court's Liquidation Valuation*

The bankruptcy court's liquidation approach placed a Petition-Date value on the Second-Lien Collateral that was hundreds of millions of dollars lower than the Debtors themselves claimed.  It also incorporated recovery amounts that were far lower than the Debtors' documented results from sales in the Go-Forward Stores and even the results of the sales at the GOB Stores during the bankruptcy proceedings.  The bankruptcy court acknowledged that, under *Rash,* the appropriate methodology for determining the value of the collateral on the Petition Date was its replacement cost, A-4785 (225:10-16), or even retail value, in a retail customer's hands, A-4789-90 (229:15-230:5), but the court did not follow either of those approaches.  Instead, the court applied a liquidation valuation purportedly based on what might have happened had there been on the Petition Date "a short-term sale process" for Sears as a business, "with the very real [possibility] of a potential liquidation."  A-4803 (243:10-13).  Remarkably, the bankruptcy court adopted a hypothetical that was the opposite of what actually happened, and the opposite of what the Debtors themselves had announced they intended to accomplish at the outset of the cases.  *See* A-227 (Meghji Declaration ¶ 10).

The bankruptcy court began its analysis by correctly rejecting the Debtors' argument that ESL itself had agreed in connection with the Sale that the inventory

was worth only 85% of its book value, explaining that there was no "binding agreement" to that effect.  A-4794-95 (234:17-25).

However, the bankruptcy court then proceeded to slash the value of the Petition Date inventory to a number far lower than even the Debtors claimed it was worth, concluding that the inventory had a value on the Petition Date of only $2.090 billion, A-3208 (507(b) Order), or approximately *77%* of its book value. *See* A-3336 (Borrowing Base Certificate).  ***That was nearly $200 million less than the value the Debtors themselves had asserted*** with their flawed 85% metric, and also over half a billion dollars less than the valuation by ESL's expert, Schulte, nearly one billion dollars less than the valuation by Wilmington Trust's expert, Henrich, and over $100 million less even than Cyrus's expert, Murray, using her conservative Minimum Case.

To reach its valuation, the bankruptcy court began by *sua sponte* declining to attribute ***any*** value at all to roughly $300 million in so-called "ineligible inventory"—inventory that the Debtors' First-Lien Lenders had excluded in determining the base against which the Debtors could borrow (the "<u>Borrowing Base</u>"), but which even the Debtors acknowledged had substantial value that was realized through sales, both pre-bankruptcy and during the course of the bankruptcy proceedings.  *See* A-3208 (507(b) Order).  This included in-transit inventory, which was ultimately delivered to the Debtors and sold during the

proceedings.  The bankruptcy court nonetheless ascribed it *zero value* based on its misinterpretation of an unambiguous Tiger appraisal.  *See* A-4797 (237:18-21). Tiger actually put specific values on the in-transit inventory ranging from 51.6% to 54.8%.  *See* A-3545.  Even the lowest of those percentages would have resulted in an in-transit inventory value of $74.6 million.  *See* A-2030 (Murray Report).

The bankruptcy court also discounted the value, as of the Petition Date, of the so-called "eligible inventory" (the inventory that was included in the Borrowing Base) to *88.7%* of its book value.  The combination of the bankruptcy court's valuations—0% for ineligible inventory and 88.7% for eligible inventory— resulted in the court's blended average for all of the inventory of only 77% of book value, markedly less than even the Debtors' claim that the inventory was worth 85% of book value.  Moreover, the court's discounts ignored the undisputed evidence that the Debtors had sold all of their eligible and ineligible inventory post-petition at markedly higher valuations—*95%* of book value at the GOB stores and *more than 100%* of book value at the Go-Forward stores.  *See* A-1838 (Griffith Declaration).

The bankruptcy court further reduced its valuation of the collateral by an additional 1.3% discount (amounting to $31.1 million) for "corporate overhead" costs, even though it held that the Debtors had not met their burden of proof to surcharge the collateral under Section 506(c) for such costs.  A-4809 (249:18-22).

34

The additional 1.3% discount was in direct conflict with the bankruptcy court's own finding that the Debtors did not met their burden of proof regarding their request to surcharge the collateral under Section 506(c).  A-4809 (249:18-22); A-3208 (507(b) Order).

The bankruptcy court also made a number of additional legal and factual errors with respect to valuation of the remaining parts of the Second-Lien Collateral.

*Pharmacy Scripts and Receivables*.  Under the parties' security agreement, the Second-Lien Collateral included inventory and receivables and "all books and records pertaining to the Collateral."  A-3431 (Second Lien Security Agreement § 2.1).  The bankruptcy court ruled correctly that pharmacy receivables were Second-Lien Collateral, A-4798 (238:21-22).  But it then ruled incorrectly that Scripts—prescriptions written by doctors and presented to Sears by customers with pending rights to refill—were not Second-Lien Collateral, on the ground that, as a matter of law, Scripts are neither receivables nor books and records relating to that collateral.  A-4800 (240:2-13).  The bankruptcy court also stated that if it had concluded the Scripts were collateral, it would have valued them at only 38.1% of their book value, based on its interpretation of Tiger's initial appraisal report of the value of those Scripts in a liquidation.  A-4798 (238:13-17).

*Post-petition Interest.*  The bankruptcy court purported to take into consideration the "'post-bankruptcy reality'" by deducting a ***hypothetical*** $34 million of ***post***-petition interest payments to the first-lien creditors from the value of collateral available on the Petition Date.  A-4801-02 (241:15-242:17) (citation omitted).

*Credit Card Accounts Receivable.*  Schulte and Henrich valued credit card receivables at their book value of $64.2 million to reflect their near certainty of collection—the party obligated to pay Sears was the bank or other issuer of the credit card, not the underlying consumer—as reflected by the fact that the Debtors' outside public accountants allowed these assets to be reported in Sears' SEC financials as cash.  A-2887 (Schulte Report); A-3076 (Henrich Declaration).  In contrast, the Debtors valued these receivables at $46.6 million, by applying a 15% discount to the Borrowing Base value.  A-2805-06.  Although the bankruptcy court had rejected the Debtors' valuation approach, it adopted the Debtors' valuation of $46.6 million on the ground that the Second-Lien Holders had, notwithstanding Schulte's testimony and the documentary record, failed to meet their burden to establish the receivables' value.  A-4798 (238:1-20).

*Cash.*  Under the parties' security agreement, the Second-Lien Collateral included the proceeds of all collateral, including the proceeds of all inventory and receivables.  A-3431 (Second Lien Security Agreement § 2.1).  Although the

Debtors' own witness, Griffith, conceded that he was unaware of any source of cash for Sears other than cash generated by the sales of inventory or the collection of receivables, A-4213-14 (78:19-79:4), the bankruptcy court declined to give the roughly $116 million in cash that Sears had on the Petition Date any value on the ground that there had not been any "tracing" to determine whether that cash was the proceeds of the Second-Lien Collateral.  A-4799 (239:3-18).  Without explanation, the court also implicitly rejected Schulte's and Henrich's uncontroverted conclusions that, as a practical matter, the First-Lien Lenders would have first satisfied their debt with the Debtor's cash, on which they unquestionably had a lien, before resorting to other, less liquid collateral and that, therefore, the Second-Lien Holders would, in any event, have obtained the benefit of that cash by reducing the senior debt ahead of them.  A-4288 (61:12-17); A-3073, 3075.

> 2.  *The Bankruptcy Court's Improper Deductions of the Value of Unfunded Stand-by Letters of Credit*

After finishing its calculation of the Petition-Date value of the Second-Lien Collateral, the bankruptcy court next turned to determining the amount of First-Lien Debt that had to be deducted from that collateral to determine how much value was available to the Second-Lien Holders on the Petition Date.  *See* A-4800-01 (240:20-241:1).

The court first appropriately deducted the actual funded amount of First-Lien Debt outstanding as of the Petition Date of approximately $1.53 billion.  A-4800 (240:8-11).

Next, the bankruptcy court concluded that it should deduct approximately $395 million in entirely contingent obligations in the form of entirely undrawn stand-by letters of credit issued by the First-Lien Lenders.  The court reached this conclusion based on its view that the letters of credit likely would have been drawn had there been a liquidation.  A-4803-05 (242:25-245:1).

The bankruptcy court's speculation about what "might" have occurred in a liquidation is not supported by any evidence in the record and ignored the undisputed facts of what actually did happen in this case.  The stand-by letters of credit had been issued by financial institutions under a pre-petition asset-based loan facility (the "Pre-Petition ABL Facility"), as well as under a separate stand-alone facility (the "Stand-Alone L/C Facility").  *See* A-19-20 (Riecker Declaration ¶ 34).  As of the Petition Date, there were $123.8 million in letters of credit issued under the Pre-Petition ABL Facility and $271.1 million outstanding under the Stand-Alone L/C Facility, for a total of approximately $395 million.  *Id.*  There is no dispute that, as of the Petition Date, the stand-by letters of credit were entirely intact and undrawn.  And there is no dispute that only $9 million of the approximately $395 million in contingent stand-by letters of credit were actually

38

drawn during the bankruptcy case.  A-2948.  Finally, there is no dispute that the Debtors were relieved of the underlying contingent liabilities secured by the remaining undrawn letters of credit when those obligations were assumed by Transform, the buyer in the Sale Transaction.  *See* A-4405 (178:10-15).  Nonetheless, for purposes of its Section 507(b) analysis, the court assumed a liquidation of the Debtors, rather than a going-concern sale, assumed the full draw of the letters of credit in that liquidation, and therefore decided to treat the letters of credit as if they had been fully drawn in their face amount of $395 million as of the Petition Date—thus erasing $395 million of Second-Lien Collateral value and a like amount of Section 507(b) Claims.

The bankruptcy court also failed to acknowledge that the Stand-Alone L/C Facility had been fully collateralized by ESL and Cyrus, which were the lenders under that facility, with cash.  *See* A-4491 (264:13-20).  As such, ESL and Cyrus had the choice of extending the letters of credit upon their expiration and extending the Facility upon its maturity.  Since a beneficiary typically does not have the right to draw on a stand-by letter of credit if it has been extended, no letters of credit would have ever been drawn unless ESL and Cyrus declined to extend them.  But Cyrus and ESL had every incentive to extend them.  *See* A-4635-42 (75:15-82:13).  In fact, Cyrus and ESL did extend expiring letters of credit on more than one occasion during the bankruptcy.

Finally, before changing their position for this dispute, even the Debtors themselves did not deduct the face amount of the first-lien L/C Facilities from their analysis of the collateral cushion available to the Second-Lien Holders as of the Petition Date when they sought debtor-in-possession financing.  *See* A-407-08 (Riecker Declaration ¶ 8).  Nor did the Debtors include the letters of credit as outstanding funded debt in their public financial statements.  *See* A-1980 (Murray Report ¶ 40).  The Debtors only reversed their course on this issue as a result of their litigation strategy, not as a result of any change in underlying facts.

* * *

After taking into account all of the discounts and exclusions of collateral, the bankruptcy court concluded that the value of the Second-Lien Collateral on the Petition Date was only $186.6 million—***over $1 billion less than what the Debtors had represented the book value of that collateral was for the Second-Lien Holders when the Debtors sought and obtained bankruptcy court approval of the Final DIP Order and nearly $180 million less than even the Debtors claimed ($373.1 million), after the fact, in this litigation***.[8]

---

[8] For the convenience of the Court, a chart comparing the bankruptcy court's analysis to that of the Second-Lien Holders' experts and the Debtors' lay witness is attached in the Addendum to this brief.

3.     *The Bankruptcy Court's Implicit Surcharge*

The bankruptcy court correctly denied the Debtors' request to surcharge the administrative costs of the proceeding against the Second-Lien Collateral pursuant to Bankruptcy Code section 506(c), finding that the Debtors had not met their burden to show that the expenses to be surcharged had been incurred by the Debtors for the "primary and direct benefit" of the Second-Lien Holders, as "Second Circuit case law requires."  A-4809 (249:18-22) (quotation marks omitted).[9]

Nevertheless, the bankruptcy court acknowledged that its 1.3% discount for "corporate overhead" (amounting to $31.1 million) constituted such a surcharge, stating "[t]he valuation of the collateral that I have given already takes into account costs of realizing on the collateral, not only the so-called 'four-wall' costs . . . but also my belief as to proper costs applied for corporate overhead attributable to the collateral, and legal fees and professional fees directly attributable to the collateral."  A-4808-09 (248:17-24; 249:18-22).  Thus, the court denied the Debtors' requested surcharge for a failure of proof, but then nonetheless imposed its own.

---

[9] The Debtors have separately appealed the bankruptcy court's denial of their Section 506(c) surcharge request.  *Sears Holdings Corp. et al. v. ESL Investments, Inc., et al.*, No. 7:19-cv-08002 (S.D.N.Y. filed Aug. 27, 2019).

4.    *The Bankruptcy Court's Erroneous Ruling Regarding the Limitations on ESL's Sources of Recovery for Its Section 507(b) Claims*

Because the bankruptcy court concluded that the $433.5 million that the Second-Lien Holders realized through their Credit Bid was greater than the value of the Second-Lien Collateral on the Petition Date, it determined that the Second-Lien Holders were entitled to no Section 507(b) Claim.  But it also held that, even if they were, ESL had agreed to limit its recovery from all possible sources to $50 million.  In particular, the bankruptcy court interpreted a clause in the APA limiting to $50 million the distributions ESL could receive on any Section 507(b) Claim "from the proceeds of any Claims or causes of action of the Debtors" (other than from the proceeds of claims or causes of action against ESL itself for supposed intentional misconduct, as to which ESL agreed it would not recover at all) as actually limiting to $50 million ESL's Section 507(b) recovery from any source, not merely from litigation claims and causes of action.  A-4805 (245:10-23).

## SUMMARY OF THE ARGUMENT

The bankruptcy court's decision that the Second-Lien Holders' adequate protection claims were worthless resulted from several legal errors.

*First*, the bankruptcy court materially undervalued the Second-Lien Collateral at the Petition Date by disregarding the Debtors' actual use of the

collateral and the minimum "replacement cost" standard mandated by the Supreme Court in *Rash* where, as here, a debtor retains and uses the collateral, rather than surrendering it to its secured creditor.  Instead, the court valued the collateral as if the Debtors had surrendered the collateral on the Petition Date to the Second-Lien Holders as part of a foreclosure—an event that never happened and an approach that led the court to conclude that the inventory and receivables collateral existing on the Petition Date was worth over $500 million less than its undisputed book-value replacement cost.  In effect, the court assumed in its valuation of the collateral as of the Petition Date the very harm against which the Second-Lien Holders were supposed to be protected, thus denying them the adequate protection the Final DIP Order was supposed to provide.  Alternatively, even if the court's deviation from *Rash* was justified (it was not) and even if liquidation value was the appropriate standard (it is not), the court erred when it rejected the overwhelming evidence of orderly liquidation value, including from the Debtors themselves, establishing NOLVs of 90% and higher.

*Second*, based again on its hypothetical and counterfactual liquidation paradigm, the bankruptcy court also wrongly concluded that approximately $395 million in contingent obligations under stand-by letters of credit that were entirely undrawn as of the Petition Date (and that were actually only drawn in the amount of approximately $9 million during the cases and then completely taken off the

Debtors' hands when they were assumed by Transform in the Sale Transaction) should nevertheless be counted in their full face amount as of the Petition Date and therefore deducted in full in determining the value of the Second-Lien Collateral as of that date. That too was legal error. *Rash* requires that the Debtors' actual use of the collateral, not what might have happened in a hypothetical liquidation that never came to pass, must govern when assessing the value of that collateral in bankruptcy.

*Third*, the bankruptcy court compounded these errors by "surcharging" the collateral for expenses the Debtors incurred for purposes having nothing to do with the maintenance or preservation of the Second-Lien Collateral in contravention of the Second Circuit's holdings in *Flagstaff*.

*Fourth*, the bankruptcy court likewise erred in failing to include the value of ineligible inventory, Scripts, credit card accounts receivable, and cash in the value of the Second-Lien Collateral, despite governing provisions to the contrary in the parties' security agreement and the Uniform Commercial Code, and by deducting from that value on the Petition Date post-petition interest on the senior, First-Lien Debt that could have accrued only *after* the Petition Date.

*Fifth*, the bankruptcy court incorrectly interpreted the APA as imposing a strict $50 million cap on ESL's potential Section 507(b) claims, contrary to the plain text of the agreement.

## ARGUMENT

### I.   THE BANKRUPTCY COURT ERRED IN NOT VALUING THE SECOND-LIEN COLLATERAL AT LEAST AT REPLACEMENT COST BASED ON ITS ACTUAL USE, AS REQUIRED BY *RASH*

The pivotal question in this matter was the value of the Second-Lien inventory collateral as of the Petition Date.  In determining that value, the bankruptcy court was bound by the Supreme Court's decision in *Rash* that where, as here, a debtor retains collateral and uses it, the collateral must be valued at least at its replacement cost, ***not*** at its liquidation value.

*Rash* interpreted Bankruptcy Code Section 506(a), the provision that addresses secured claims in bankruptcy.  It provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.  ***Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.***

520 U.S. at 960 (citing 11 U.S.C. 506(a)) (emphasis added).

As the Supreme Court explained in *Rash*, the first sentence of Section 506(a) does not speak to how a secured creditor's collateral is to be valued, but the second sentence does.  *Id.* at 961.  Under that sentence, "the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question."  *Id.* at 962.

*Rash* concerned the valuation of a truck on which a creditor had a lien that the chapter 13 debtor proposed to retain and use to generate revenue in its business.

45

*Id.* at 956-57.  To satisfy the secured creditor's claim, the debtor proposed to pay the creditor only the truck's foreclosure value—*i.e.*, "the net amount [the creditor] would realize if it exercised its right to repossess and sell the truck." *Id.* at 958. The creditor, however, maintained that it was entitled to the greater replacement cost of the truck—"the price the [debtor] would have to pay to purchase a like vehicle." *Id.* at 957.  The Supreme Court agreed with the creditor, ruling that when a debtor elects to retain and "use the collateral to generate an income stream," rather than surrender it to the creditor, the replacement cost to the debtor of the collateral, rather than its foreclosure value to the secured creditor, is the appropriate standard by which to calculate the value of the collateral. *Id.* at 963.[10] The Court was clear in its holding: "In sum, under § 506(a), the value of property retained . . . is the cost the debtor would incur to obtain a like asset for the same 'proposed . . . use.'" *Id.* at 965.

---

[10] Although *Rash* involved a chapter 13 plan, courts have recognized that its reasoning is equally applicable to "the provisions of all three reorganization chapters—11, 12, and 13—because these chapters all treat secured claims similarly." *In re Motors Liquidation Co.*, 482 B.R. 485, 492 (Bankr. S.D.N.Y. 2012).  The bankruptcy courts in this circuit have also recognized, as the bankruptcy court did here, that the same test applies when determining if there has been a diminution in the value of the value of collateral justifying a super-priority claim under Section 507(b) of the Bankruptcy Code. *See In re Residential Capital, LLC*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013).

Here, just as in *Rash*, the Debtors did not surrender the collateral to the secured creditors, but instead retained and used that collateral for their own benefit. The Debtors sold the Second-Lien Collateral both in GOB Sales and through ordinary course sales at the Go-Forward stores to generate money to fund the operating expenses of the bankruptcy and to create an income stream to support their ultimate going-concern sale of the Debtors' entire business.  In this case, just as in *Rash*, the undisputed "reality" was "no foreclosure sale and economic benefit for the debtor derived from the collateral."  *Rash*, 520 U.S. at 963.  Accordingly, the bankruptcy court was required to value the collateral according to this actual use, rather than by conducting a hypothetical foreclosure valuation of the collateral, regardless of (and indeed despite) its actual disposition.

Moreover, any variation from *Rash*'s replacement-cost standard should be the higher retail value, not a lower liquidation value.  As the Supreme Court stressed in *Rash*, "actual use . . . is the proper guide under a prescription hinged to the property's 'disposition or use,'" *Rash*, 520 U.S. at 963; *see also In re Sunnyslope Hous. L.P.*, 859 F.3d 637, 644 (9th Cir. 2017) (*en banc*) ("the valuation must instead reflect the property's 'actual use'").

In this case, the collateral was not a truck to be used by the debtor, as in *Rash*, but rather inventory intended to be sold by the Debtors at retail in the ordinary course of their business.  *See* A-4716 (156:24-25) ("[T]he company exists

to run a retail operation to sell the inventory.")  The Debtors, of course, sold their inventory at a markup to book, or replacement, value.  Consequently, any variation by the bankruptcy court from the replacement cost standard applied in *Rash* should have been to apply the higher, retail value.  Otherwise, the increase in the value of the inventory between replacement value and retail value would not be captured for the benefit of the Second-Lien Holders, who hold a lien on the inventory and proceeds of its sale, but would constitute a windfall for the Debtors and their unsecured creditors.  But, at a minimum, the court was required as a matter of law to value the collateral at its replacement cost.  Its failure to do so was reversible, legal error.

### A.     There Is No Legal Basis for the Bankruptcy Court's Departure from *Rash*

Despite acknowledging *Rash*'s mandate that "the court should look to the purpose of the proposed use of the asset," A-4785 (225:10-16), the bankruptcy court disregarded those clear instructions.  Notably, the very grounds offered by the bankruptcy court to justify its departure from the Supreme Court's binding authority were considered and ***rejected*** by the Supreme Court in *Rash*.

*First*, in declining to value the collateral based on its replacement cost, the bankruptcy court suggested that such a valuation was "simply not tied to reality, i.e., the normal realizable value of this collateral . . . at the start of this case."  A-4791 (231:4-21); A-4687 (127:22-24) ("No, but we know that that was not how

48

your clients were going to realize any value.  They were never going to get value

that way.").  But an approach that focuses on what the secured creditor would have

realized in a counter-factual hypothetical in which the debtor surrenders that

collateral to the creditor is precisely what the Supreme Court dismissed in *Rash* as

contrary to the plain language of the statute.

The Supreme Court explained that "[a]pplying a foreclosure-value standard"

when the debtor retains and uses the collateral improperly "attributes no

significance to the different consequences of the debtor's choice to surrender the

property or retain it.  A replacement-value standard, on the other hand,

distinguishes retention from surrender and renders meaningful the key words

'disposition or use.'"  520 U.S. at 962 (quoting the statute).  The Supreme Court

explained that, "[f]rom the creditor's perspective as well as the debtor's, surrender

and retention are not equivalent acts."  *Id.*  As the Supreme Court acknowledged:

> If a debtor keeps the property and continues to use it, the creditor
> obtains at once neither the property nor its value and is exposed to
> double risks:  The debtor may again default and the property may
> deteriorate from extended use.  Adjustments in the interest rate and
> secured creditor demands for more "adequate protection," 11 U.S.C. §
> 361, do not fully offset these risks.

*Id.* at 962–63.  As a result, "the secured creditor may receive far less in a failed

reorganization than in a prompt foreclosure."  *Id.* at 963 (citation omitted).

Accordingly, the Supreme Court deliberately chose the more protective

replacement value formulation in order to account for the risks a secured creditor

49

faces from the debtor's ongoing use of the collateral and rejected concerns that the standard would result in an improper "windfall" to the secured creditor simply because the creditor might not have realized the full replacement value if the debtor had surrendered the collateral to the creditor.

*Second*, the bankruptcy court also attempted to justify its departure from *Rash* by suggesting that a going-concern standard was not appropriate in this case because the expectation when Sears filed for bankruptcy was that there would be "either a going concern sale in the context of competing liquidation bids, or no going concern bid acceptable and [a pivot] to a liquidation." A-4787-88 (227:24-228:5). The short answer is that there was no such "pivot." But, even more importantly, *Rash*'s replacement-value valuation standard does not depend on a bankruptcy court's speculation as to whether a debtor will succeed in its intended use of the secured creditors' collateral. Rather, under *Rash*, all that matters is whether the debtor retains the collateral and uses it. Indeed, the Court acknowledged that the "vast majority of [Chapter 13] reorganizations fail." 520 U.S. at 963. Thus, it was entirely possible—in fact, likely if the history of other Chapter 13 cases was predictive—that Rash would ultimately default. But that did not matter in the Supreme Court's analysis. All that mattered was that the debtor proposed to retain and use the collateral, just as the Debtors did here.

*Third*, the bankruptcy court cited a few cases and legislative history purportedly demonstrating that it had discretion to value the assets anywhere within a wide "spectrum between the sale of a true, financially healthy going concern business and a forced liquidation." A-4787 (227:17-18) (quoting *In re Aerogroup Int'l, Inc.*, 601 B.R. 571, 593 (Bankr. D. Del. 2019)); *see also* A-4789 (229:15-20) (citing *In re T.H.B. Corp.*, 85 B.R. 192 (Bankr. D. Mass. 1988)); A-4783 (223:4-12) (quoting legislative history of Section 506(a)). But *Rash* rejected cases that had applied foreclosure value even where the debtor was a going concern, as well as caselaw holding that it was appropriate for the bankruptcy court to choose a "midpoint" between foreclosure and replacement value. *See* 520 U.S. at 964.[11] As the Supreme Court noted, "we also reject a ruleless approach allowing use of different valuation standards based on the facts and circumstances of individual cases," *Rash*, 520 U.S. at 964, n.5 (rejecting *In re Valenti*, 105 F.3d 55, 62-63 (2d Cir. 1997)), which held that it was permissible for the bankruptcy court to use different valuation standards on a case-by-case basis.[12]

---

[11] Indeed, even before the Supreme Court decided *Rash*, the First Circuit had rejected the liquidation approach taken by the bankruptcy court in *T.H.B.  See In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 75 (1st Cir. 1995).

[12] Similarly, the bankruptcy court improperly relied on a pre-*Rash* case, *In re Craddock-Terry Shoe Corp.*, 98 B.R. 250, 253-54 (Bankr. W.D. Va. 1988), to support its choice to "determine 'the most commercially reasonable disposition practicable in the circumstances.'" *See, e.g.*, A-4784 (224:10-12). That simply is not the law after *Rash*.

Further, *Rash* gave "no weight to the legislative history of § 506(a)" because "it is unedifying, offering snippets that might support either standard of valuation." *Rash*, 520 U.S. at 963 n.4. Consequently, the bankruptcy court erred as a matter of law in looking to the legislative history to support its decision.

Contrary to the bankruptcy court's assertions, since *Rash*, "[c]ourts have consistently held that when assets are sold in bankruptcy 'as part of the business as a going concern,' 'going-concern' value, as opposed to liquidation value, is appropriate under section 506(a)(1) and *Rash*." *In re Motors Liquidation Co.*, 576 B.R. 325, 423–24 (Bankr. S.D.N.Y. 2017), *leave to appeal denied sub nom. Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, No. 17-CV-8712(AJN), 2018 WL 4284286 (S.D.N.Y. Sept. 7, 2018); *see also In re Sunnyslope Hous.*, 859 F.3d at 645 ("We cannot depart from [a replacement value] standard without doing precisely what *Rash* instructed bankruptcy courts to avoid— assuming a foreclosure that the Chapter 11 petition prevented."); *In re SK Foods, L.P.*, 487 B.R. 257, 262 (E.D. Cal. 2013) ("The Bankruptcy Court was thus correct to use the valuation that made sense in light of its purpose and the proposed disposition of the assets—a going-concern sale.").

For these reasons, the bankruptcy court's reliance on *Official Committee of Unsecured Creditors v. UMB Bank, N.A.* (*In re Residential Capital, LLC*), 501 B.R. 549 (Bankr. S.D.N.Y. 2013) ("*ResCap*"), for the proposition that the Debtors

could not have obtained fair market value for their inventory as of the Petition Date, A-4788-89 (228:8-229:14), was misplaced.

In *ResCap*, the court held that "[a] going concern valuation" was the appropriate methodology to value the secured creditors' collateral because it "is consistent with the Debtors' stated purpose in this case as of the Petition Date." *ResCap*, 501 B.R. at 595.  The *ResCap* court distinguished, however, between the valuation of two separate categories of assets held by the debtors:  (1) the servicing and origination assets held by the debtors, including the debtors' servicing and origination business, and (2) the sale of whole loans held in the debtors' whole loan portfolio.  *Id*. at 568, 575-76.  The *ResCap* court concluded that an assumption that the debtors' servicing assets could have been sold on the Petition Date by the debtors "ignores reality" because, among other things, the assets could not be sold without "obtaining the requisite consents" from governmental entities and mortgage-backed security trustees in order to "sell the assets free and clear." *Id*. at 596.  With respect to the whole loans, however, no such consents were required, and the court held that their value "is conclusively determined by the price paid."  *Id.* at 603.  Here, no regulatory consents were required for the Debtors to continue to sell their inventory from and after the Petition Date.  11 U.S.C. § 363(c)(1).

In short, the bankruptcy court had no legal basis to diverge from *Rash*.

53

### B.     The Record Fully Supports Schulte's Valuation of the Collateral

On the only question that matters under *Rash*—what was the replacement

cost for the inventory?—the record was uncontroverted.  As Schulte testified

without contradiction, the inventory's book value "roughly approximate[d its]

replacement value."  A-2051 (Schulte Report).  Indeed, the Debtors actually

replaced $1 billion in inventory collateral following the Petition Date at book

value.  A-2061 (Schulte Report).[13]

Accordingly, Schulte valued the inventory that the Debtors sold after the

Petition Date at the Go-Forward stores at its book value, just as *Rash* required.

And Schulte valued the inventory that the Debtors sold during the bankruptcy case

at their GOB Stores at 95.5% of its book value, because—unlike the sales at the

Go-Forward stores, which realized proceeds in excess of book value even after

deducting for the costs of sale—that is what those sales actually achieved, again

after deducting for all direct costs.  A-2050-051 (Schulte Report).  This was close

to, but slightly lower than, the values that Sears had realized in the myriad GOB

Sales it had conducted before it filed for bankruptcy.  *See* A-2050.  Thus, unlike

the bankruptcy court, which failed to follow *Rash*, Schulte did so, valuing the

collateral based on its actual use by the Debtors, precisely as *Rash* mandates.

---

[13] This was also consistent with the Debtors' statements in their audited publicly
filed SEC financials that inventory book value represented "the lower of cost or
market" value.  A-3694 (Form 10-K).

Similarly, Henrich followed *Rash* by valuing the inventory collateral as it was used by the Debtors:  in sales at retail at the Go-Forward Stores, net of direct selling costs and overhead, and, in the case of the GOB Stores, based on the actual results of those sales.

### C.   Alternatively, Even If the Bankruptcy Court's Framework Was Consistent with *Rash*, It Erred by Rejecting Net Orderly Liquidation Values Higher Than 88.7%

Even if this Court determines that the bankruptcy court did not err by using a liquidation valuation, the bankruptcy court erred by rejecting the overwhelming and uncontroverted evidence of NOLVs of the Second-Line Collateral substantially higher than 88.7%.

As discussed, Murray's Minimum Case valuation of the Debtors' inventory relied on the 88.7% NOLV used by Tiger.  Murray noted that her Minimum Case was conservative because, among other things, multiple other parties in the bankruptcy case had used higher NOLVs (and did so outside of a litigation context).  As noted, these parties included the Debtors' own CFO ($2.74 billion), the Debtors' own CRO (90%), the UCC (90%), the Debtors' own liquidation agent Abacus (90.1% to 93.1%), and multiple third-party liquidators (89.4% to 91.7%). Murray explained that each of these indications of value yielded a Section 507(b) Claim substantially higher than her Minimum Case.  *See* A-2970-73 (Murray Declaration ¶ 11).

But the Bankruptcy Court rejected all of these indications of value, for three stated reasons.  First, the bankruptcy court stated there was "no detail in the record as to what collateral was covered" by the indications.  *See* A-4795-96 (235:22-236:18).  Second, the bankruptcy court stated there was "no detail on the record as to what...costs were netted out" of the indications of value.  *Id*.  Third, the bankruptcy court stated that the indications were "just . . . proposals" that "were not accepted, and, therefore, not binding on anyone."  *Id*.  None of the bankruptcy court's stated reasons justified its disregard of the undisputed record.

As an initial matter, there was sufficient record evidence of the collateral covered by a number of the indications of NOLV.  For example, Abacus's net recovery projection stated that it covered the liquidation of Sears' "remaining 425 store footprint."  *See* A-3532.  It further explained that for those 425 stores, it covered "Wholesale Inventory," "SAC [*i.e.*, Sears Auto Center] Inventory," and "On the Water Inventory," and valued that collateral on both an "at Cost" and "Gross Recovery" basis.  *See* A-3533.  The detailed chart accompanying Abacus's analysis is reproduced below, with a green box placed around the covered collateral.

| ($ in millions) | Scenario 1 | | Scenario 2 | |
| --- | --- | --- | --- | --- |
| | $ | % Of Total Inventory at Cost | $ | % Of Total Inventory at Cost |
| Total FLS/Kmart GOB Eligible Inventory at Cost | $ 1,445.1 | 95.7% | $ 1,445.1 | 95.7% |
| Wholesale Inventory at Cost | 18.1 | 1.2% | 18.1 | 1.2% |
| SAC Inventory at Cost | 21.9 | 1.4% | 21.9 | 1.4% |
| On the Water Inventory at Cost | 25.0 | 1.7% | 25.0 | 1.7% |
| Total Inventory at Cost | 1,510.1 | 100.0% | 1,510.1 | 100.0% |
| FLS/Kmart Gross Recovery | 1,741.4 | 115.3% | 1,792.0 | 118.7% |
| Wholesale Inventory Gross Recovery | 12.4 | 0.8% | 12.4 | 0.8% |
| SAC Inventory Gross Recovery | 11.1 | 0.7% | 11.1 | 0.7% |
| On the Water Inventory Gross Recovery | 25.0 | 1.7% | 27.5 | 1.8% |
| Total Gross Recovery | 1,789.9 | 118.5% | 1,843.0 | 122.0% |
| Total Payroll | (180.6) | -12.0% | (180.6) | -12.0% |
| Advertising & Promotional Costs | (20.0) | -1.3% | (20.0) | -1.3% |
| Store Occupancy Expense | (99.7) | -6.6% | (99.7) | -6.6% |
| Other Operating Expenses[1] | (67.8) | -4.5% | (67.8) | -4.5% |
| On-site Supervision | (15.0) | -1.0% | (15.0) | -1.0% |
| Total Direct Sale Expenses | (383.2) | -25.4% | (383.2) | -25.4% |
| Royalties | (3.7) | -0.2% | (3.7) | -0.2% |
| Corporate Costs | (40.0) | -2.6% | (40.0) | -2.6% |
| Net Recovery Before Liquidator Fee | 1,363.1 | 90.3% | 1,416.2 | 93.8% |
| Liquidator Fee | (0.9) | -0.1% | (0.9) | -0.1% |
| Net Recovery After Liquidator Fee | $ 1,362.2 | 90.2% | $ 1,415.3 | 93.7% |
| Additional Proceeds Not Part of Liquidation Bids | 87.3 | 5.8% | 88.7 | 5.9% |

[1] Other Operating Expenses include merchandise transfers, credit card fees, security, inventory insurance, independent inventory costs, central services, and store miscellaneous expenses. Abacus' scenarios do not include any costs for central services, inventory insurance or independent inventory costs because the expenses are related to equity bids.

*Id.*

Next, there was sufficient record evidence of the costs netted out of the indications. Once again using Abacus as an example, Abacus's projection netted out a broad variety of direct and indirect costs that would be associated with liquidating the inventory at the remaining 425 stores. These netted costs included "Corporate Costs [*i.e.*, overhead]," "Payroll," "Advertising & Promotional Costs," "Royalties," "Liquidator Fee[s]," and numerous "Operating Expenses" including "credit card fees," "inventory insurance," and "store miscellaneous expenses." *See* A-3533. A red box is placed around the netted costs in the Abacus chart reproduced above. Abacus's projection further stated that its expense amounts

57

were estimated "*based on historical experience*," among other things.  *Id.* (emphasis added).  And Abacus had deep historical experience upon which to draw, given its long service as the Debtors' own liquidation advisor:  the record indicates that "Abacus . . . has provided store closing sale services to the Company since 2006 and has closed over 1,950 [Sears] store locations."  *See* A-3860; *see also* A-4218-19 (204:15-205:5).

In addition, the bankruptcy court's characterization of these indications of value as "just . . . proposals," that were "not accepted" and "not binding," was both incorrect and not a basis to reject the indications in any event.  Characterizing the 90% NOLV projected by the Debtors' CRO Mr. Meghji, and the $2.74 billion NOLV stated by the Debtors' CFO Mr. Riecker, however, as something akin to an un-accepted offer, is a non-sequitur—these were *the Debtors' own analyses*, not bids from third parties who lacked familiarity with the Debtors and their assets.

The "just . . . proposals" characterization is equally inapplicable to Abacus. As noted, Abacus was the Debtors' own liquidation advisor, and it had liquidated inventory at almost 2,000 Sears stores over more than a decade, including over 200 stores during the bankruptcy case.  *See* A-3536; A-4218 (204:22-25).  Moreover, the record indicates that Abacus made its net recovery projection under *its pre-existing service agreement with the Debtors*.  *See* A-3532 (stating "Abacus

affirmed that its agreement with the Company applies to the remaining 425 stores"
and noting "Abacus's affirmation of its existing arrangement").

Indeed, Abacus was so closely tied to Sears that an internal Sears deck states
that Abacus's net recovery projection was the projection of "Abacus *and the
Company.*"  *See* A-3533 (emphasis added).  At trial, the Debtors' witness Griffith
agreed that "this was not just Abacus' projection, but the projection of the
[C]ompany." *See* A-4435 (208:22-24).  Finally, the record is undisputed that in
January 2019, the Debtors' lead outside counsel, Weil Gotshal & Manges,
recommended to the Restructuring Committee of the Debtors' Board of Directors
that it "proceed with a liquidation advisor team consisting of Abacus Advisors and
SB360 Capital Partners in the event of a wind down."  *See* A-3523.  Griffith
testified that he was not aware of that recommendation ever changing.  *See* A-4220
(210:3–11).[14]

The bankruptcy court's refusal to give any weight to even a single one of
these various reliable, independent indications of value was clear error.  *See, e.g.*,
*Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283,
347-48 (Bankr. S.D.N.Y. 2007) ("important part" of analyzing financial state of

---

[14] In addition, the UCC—which strenuously, and unsuccessfully, backed a
liquidation instead of the Sale Transaction—relied on Abacus.  The UCC's
liquidation analysis assumed a liquidation "led by incumbent liquidator Abacus
Advisors and SB360," at "~90% NOLV."  *See* A-3875.

debtor involves evaluating reasonableness "of the debtor's own projections," and indications of reasonableness include "management's input into the creation of the projections" as well as assessments from investors and analysts); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 229 (Bankr. D.N.J. 2000) (the most credible valuation analysis was offered by the debtors' financial advisor, who "was familiar with all aspects of the debtors' financial status[,]…had access to debtors' management, and [had] reviewed and tested debtors' projections").

## II.    THE BANKRUPTCY COURT ERRED BY DEDUCTING APPROXIMATELY $395 MILLION FROM THE SECOND-LIEN HOLDERS' CLAIMS BASED ON THE ASSUMPTION THAT, IN A HYPOTHETICAL LIQUIDATION, CONTINGENT STAND-BY LETTERS OF CREDIT WOULD BE FULLY DRAWN

The bankruptcy court also erred when it concluded that the full face amount of stand-by letters of credit—approximately $395 million—should be deducted from the collateral cushion supporting the Second-Lien Debt on the Petition Date. *See* A-4801-05 (241:15-242:1, 242:25-245:1).  The Debtors would have only become obligated to reimburse the issuing lenders for those letters of credit if they were actually drawn.  Here, the bankruptcy court reached its flawed conclusion based upon its own speculation about possible post-Petition Date draws that might occur if the Debtors chose to liquidate, but the court had no reason to engage in that speculation in the first place.  The facts regarding the status and ultimate disposition of the letters of credit were undisputed:  the letters of credit were

undrawn as of the Petition Date, were only drawn in the amount of $9 million during the cases, and were taken completely off the Debtors' hands when they were assumed by Transform, the buyer in the going-concern sale.

The starting point of the Section 507(b) analysis is the value of the collateral on the Petition Date (*see In re Residential Capital, LLC*, 501 B.R. at 592). On the Petition Date, the stand-by letters of credit were completely undrawn. Even if it was appropriate for the bankruptcy court to consider the possibility that the stand-by letters of credit might be drawn post-petition, with minor exception the letters of credit remained undrawn throughout the entire bankruptcy case.

Specifically, on the Petition Date, the Debtors had two first-lien letter of credit facilities (collectively, the "L/C Facilities"), consisting of outstanding, but undrawn, stand-by letters of credit that secured principally potential worker's compensation obligations. *See* A-19-35 (Riecker Declaration). Such stand-by letters of credit are "usually intended to be activated only if the applicant has failed to perform his obligations in the underlying contract." *See* Peter Ellinger & Dora Neo, *The Law and Practice of Documentary Letters of Credit* 308 (2010). "Since no one expects failure, no one expects a draw on the standby letter of credit." *See* James J. White & Robert S. Summers, *Principles of Payment Systems* 521 (2008). *See In re Enron Creditors Recovery Corp.*, 370 B.R. 64, 87 (Bankr. S.D.N.Y. 2007), *rev'd in part on other grounds*, 380 B.R. 307 (S.D.N.Y. 2008) (finding that

letter of credit reimbursement obligations were not senior debt as prior to a draw

on a letter of credit the reimbursement obligation is "contingent on the occurrence

of the draw").  And as long as they remained undrawn, the L/C Facilities would not

have given rise to any reimbursement obligation by the Debtors to the issuing

lenders, and they therefore would not have diminished the value of the Second-

Lien Collateral as of the Petition Date.  *See* A-2052-053 (Schulte Report).

The Debtors recognized as much.  Consistent with their highly contingent

nature, the Debtors themselves did not deduct the face amount of the L/C Facilities

from their analysis of the Second-Lien Collateral when they sought during the

bankruptcy case priming debtor-in-possession financing.  *See* A-407-08 (Riecker

Declaration).  Nor did Sears include the L/C Facilities in outstanding funded debt

in their public financial statements.  *See* A-1980 (Murray Report ¶ 40).  The

Debtors were right (though they later conveniently changed their position when the

Second-Lien Holders asserted their Section 507(b) Claims).

In a going-concern sale, it is common for letters of credit not to be drawn but

instead to be cancelled, reissued, or assumed by the buyer.[15]  The actual reality of

---

[15] *See, e.g., In re Frontier Airlines Holdings, Inc.*, No. 08-11298 (RDD) (Bankr.
S.D.N.Y. Sept. 8, 2019), ECF No. 1058 (plan of reorganization calling for the
assumption of each letter of credit); *In re The Gymboree Corp.*, No. 17-32986 (KLP)
(Bankr. E.D. Va. July 24, 2017), ECF No. 447 (plan of reorganization provided that
the $10 million prepetition letter of credit is deemed assigned to the reorganized
debtor or cancelled).

the bankruptcy case was consistent with this expectation—the underlying contingent liabilities for workers compensation and the like secured by the L/C Facilities were assumed by Transform in the Sale Transaction, *see* A-1503 (Sale Order), and of the approximately $395 million in outstanding letters of credit on the Petition Date, only $9 million were drawn after the Petition Date but before the Sale Transaction closed, *see* A-3851 (Excel Spreadsheet of LC Draws).

The bankruptcy court's decision to deduct the entire $395 million in L/C Facilities when valuing the Second-Lien Holders' interest in the collateral was thus contrary to the central thrust of *Rash*—that a secured creditor's interest in collateral must be valued based on the debtor's actual disposition of that collateral, not based on a hypothetical liquidation that never occurs.

In addition, the bankruptcy court lacked any reliable evidence on which to base its speculation that all of the letters of credit would be drawn even in an orderly liquidation. While the Debtors' witness Griffith testified that in a liquidation letters of credit are "almost always fully drawn," he also readily conceded that he was not aware of a single instance where all letters of credit were drawn in an orderly chapter 11 liquidation of a retailer, and that he in fact had no experience with any retail liquidations whatsoever.  *See* A-2125 (Supplemental Griffith Declaration ¶13); A-4426, 4438-39 (199:7-199:25, 211:10-212:6).

The bankruptcy court also failed to take into consideration the fact that the Stand-Alone L/C Facility was cash-collateralized by ESL and Cyrus. As such, ESL and Cyrus would have had the choice of extending the Stand-Alone Facility upon its expiration. A beneficiary typically does not have the right to draw on a letter of credit if it has been extended. ESL and Cyrus had every incentive to extend the Stand-Alone L/C Facility. *See* A-4635-42 (75:15-82:13). In fact, ESL and Cyrus did extend the facility during the bankruptcy.

## III. THE BANKRUPTCY COURT FAILED TO FOLLOW CONTROLLING SECOND CIRCUIT PRECEDENT BY DEDUCTING COSTS OF THE BANKRUPTCY AS PART OF ITS VALUATION PROCESS DESPITE RULING THAT THE DEBTORS HAD FAILED TO MEET THEIR BURDEN OF PROOF REGARDING ANY SUCH REQUESTED SURCHARGES

The Debtors sought to relieve themselves of any potential payment obligations on account of any diminution in the value of the Second-Lien Collateral by asserting that they were entitled, pursuant to Section 506(a) of the Bankruptcy Code, to "surcharge" the Second-Lien Collateral with over $1.4 billion in expenses of the bankruptcy proceedings. The bankruptcy court correctly concluded that the Debtors fell far short of meeting their burden to assess any such surcharge, but then inexplicably and impermissibly applied one anyway.

Section 506(c) provides a narrow and "extraordinary" exception to the general rule that debtors are not entitled to saddle a secured creditor with the administrative expenses of a bankruptcy proceeding. Under that exception, any

surcharge must be limited to "services which were for the benefit of [that secured creditor] rather than the debtor or other creditors." *Flagstaff I*, 739 F.2d at 75.  The Debtors thus had the burden to prove: (i) that the expenses were necessary; (ii) that the amounts expended were reasonable; and (iii) that the expenses directly and primarily benefitted the Second-Lien Holders. *First Servs. Grp., Inc. v. O'Connell ex rel. Ceron (In re Ceron)*, 412 B.R. 41, 51 (Bankr. E.D.N.Y. 2009) (citing *Flagstaff I* and *II*).

The bankruptcy court properly concluded that the virtually non-existent evidence provided by the Debtors, "which consist[ed] primarily of a one-page breakout of alleged costs that would fit 506(c) itemized simply by category, adding up to over a $1,400,000,000," was wholly insufficient to meet this heavy burden. A-4809 (249:11-22).

But, despite finding that it "[could not] make the 'reasonable' and 'necessary,' let alone 'primary and direct benefit' analysis that the Second Circuit case law requires," the bankruptcy court still arbitrarily deducted an additional 1.3% (amounting to $31.1 million) from the value of the Second-Lien Collateral based on its own "belief as to proper costs applied for corporate overhead attributable to the collateral, and legal fees and professional fees directly attributable to the collateral."  A-4808-09 (248:17-249:22).

This arbitrary "extra discount" to the valuation analysis was a backdoor 506(c) surcharge, which the bankruptcy court acknowledged when it noted that any further deduction on the basis of Section 506(c) "would be double counting."  A-4809 (249:7-11).  It thus was contrary to the Second Circuit's holding in *Flagstaff* that a bankruptcy court does not have discretion to charge administrative costs to a secured creditor where, as here, the debtors "failed to sustain [their] burden." *Flagstaff I*, 739 F.2d at 77; *see also In re Trim-X, Inc.*, 695 F.2d 296, 302 (7th Cir. 1982) (vacating 506(c) surcharge award where court could "discern no basis for those totals and thus [was] completely unable to gauge their reasonableness").

The bankruptcy court's explanation for its own 1.3% surcharge does not withstand scrutiny.  During its oral ruling, the bankruptcy court stated:

> Where do I come up with that extra discount?  In part from, largely from, Mr. Henrich's analysis of 506(c) claims, as well as Judge Stong's analysis in the Ceron case, in which she makes the clearly correct point that whether expenses incurred were "reasonable," requires an assessment that shows that there's some sensible proportion to the value of the benefit to be received.

A-4808-09 (248:25-249:6).  Neither Henrich's testimony nor the *Ceron* case provides support for the bankruptcy court's 1.3% surcharge.

Henrich never suggested a 1.3% surcharge.  If the bankruptcy court believed that Henrich's testimony or expert report somehow indirectly supported the 1.3% reduction, it never identified how.

The bankruptcy court's reliance on *Ceron* was also misplaced.  That case was decided under Section 506(c), not Section 507(b).  Even more importantly, there the trustee presented compelling evidence that the surcharge, which amounted to only $1,700, was for expenses that had been "necessary, reasonable, and directly benefitted" the secured creditor in accordance with Section 506(c). Here, by contrast, as the bankruptcy court itself concluded, the Debtors failed to meet their burden under Section 506(c).

The bankruptcy court's surcharge was also contrary to *Rash*, under which the appropriate valuation methodology where the debtor retains and uses the collateral is the collateral's replacement cost—"the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition."  520 U.S. at 959 n.2.  Willing buyers, of course, do not pay more for collateral in order to account for their overhead expenses.[16]  Rather, a retailer buys wholesale, sells its inventory at retail, and pays its overhead out of the gross profit so derived.  A-3079-81 (Henrich Declaration ¶¶ 52-60).

The bankruptcy court erred for the separate reason that it failed to provide any basis for how it arrived at the 1.3% reduction.  As noted, nothing in Henrich's opinion supported that amount.  Nor is it clear what costs the bankruptcy court

---

[16] The Debtors did not even seek a surcharge relating to the GOB Sales.  *See* A-4414 (187:1-4).

intended for the 1.3% surcharge to represent.  The 507(b) Order describes the

surcharge as reflecting "corporate overhead."  *See* A-3208 (507(b) Order).  But in

its oral ruling, the bankruptcy court indicated that it represented the "proper costs

applied for corporate overhead attributable to the collateral, and legal fees and

professional fees directly attributable to the collateral."  *See* A-4808 (248:22-

24).  The bankruptcy court did not delineate these costs buckets, or the relative

proportion of the 1.3% each cost bucket represented.  The court's failure to do so

was legal error.  *See United States v. Sasso*, 215 F.3d 283, 292 (2d Cir. 2000)

(district court failed to set forth findings that would reveal how it arrived at 15% as

an appropriate share of expense, preventing meaningful appellate review where the

district court stated simply that "[g]iven all of the former and present facts, the

Court feels defendant should bear approximately fifteen (15%) percent of the costs

of this first period'"); *In re Mazzeo*, 167 F.3d 139, 142-43 (2d Cir. 1999) (vacating

bankruptcy court's order lifting the automatic stay and district court's judgment

affirming that decision where bankruptcy court's "sparse factual findings make it

unclear whether the court properly applied the law;" although courts need not

include "punctilious detail [] or slavish tracing of the claims issue by issue and

witness by witnes. . . [t]he findings and conclusions must, however, at least be

sufficient to permit meaningful appellate review" (internal quotation marks and

citations omitted)).

IV.    **THE BANKRUPTCY COURT FAILED PROPERLY TO INCLUDE THE VALUE OF (A) INELIGIBLE INVENTORY AND (B) PHARMACY SCRIPTS, (C) IMPROPERLY DEDUCTED HYPOTHETICAL POST-PETITION INTEREST ON THE FIRST-LIEN DEBT, AND FAILED TO PROPERLY INCLUDE THE VALUE OF (D) CREDIT CARD ACCOUNTS RECEIVABLE, AND (E) CASH**

A.    **Ineligible Inventory**

The bankruptcy court erred in *sua sponte* declining to attribute *any* value at all to certain categories of inventory marked as "ineligible" on the Borrowing Base, including in-transit inventory.  *See* A-4796-97 (236:12-37:22).  There was no evidence in the record to support this conclusion.  To the contrary, the Debtors themselves conceded that ineligible and eligible inventory (as defined on the Borrowing Base) should *not* be treated differently for purposes of this valuation.  *See* A-2831-33 (Second Supplemental Griffith Declaration).[17]  That made sense, since the Debtors had sold both eligible and ineligible inventory for value during the bankruptcy proceedings, in both the Go-Forward and GOB Stores.  *See* A-1634 (APA § 10.9); A-1837-38 (Griffith Declaration, Ex. A).  And the Sale Transaction also did not distinguish between eligible and ineligible inventory; to the contrary, as a condition to closing of the Sale Transaction, the Debtors were obligated to

---

[17] The Debtors had every incentive and the requisite knowledge to claim that they were unable to obtain any value for their ineligible collateral if that truly had been the case.  The fact that they conceded that all of these assets should be included in the valuation should have been dispositive of this issue.  *See* A-2831-33.

69

deliver $1.67 billion in book value of inventory to Transform without regard to whether it was eligible or ineligible under the Borrowing Base.  A-1634 (APA § 10.9).

The Debtors acknowledged that book value was the appropriate starting point for valuing all inventory, *see* A-4389-90 (162:2-163:3), and that the book value of that inventory on the Petition Date was $2.69 billion, *see* A-2831-33 (Second Supplemental Griffith Declaration).  The Debtors' sole contention was that ***all*** the inventory, both eligible and ineligible, should be discounted by 15% based on the purported valuation of the remaining inventory in the Sale Transaction for purposes of the ultimate going-concern sale.  The bankruptcy court rejected that proposed discount, but then *sua sponte* applied its own, more draconian discount, valuing the ineligible inventory as worth 0% and the eligible as worth 88.7% (even before taking account of the additional 1.3% surcharge for administrative expenses that the court applied), leading to an overall, blended valuation for all the inventory of 77%—a 23% discount off of book value, far greater than even the 15% discount the Debtors argued was appropriate.  A-4390 (163:4-7).

There is no justification for the bankruptcy court's arbitrary decision to assign no value at all to ineligible inventory that the Debtors themselves conceded had approximately $300 million in book value, or a minimum value of $255

70

million if one were to adopt the Debtors' 15% proposed discount.  Although the

bankruptcy court attempted to support its conclusion by claiming that there was a

failure of proof whether the ineligible inventory had actually been sold, the

Debtors' own declaration acknowledged the sale of all the collateral.  *See* A-1838

(Griffith Declaration, Ex. A); *see also* A-1634 (APA § 10.9).  Moreover, if the

Debtors had not sold the ineligible inventory, they would be required now to

surrender it to the Second-Lien Holders, as collateral for the Second-Lien Holders'

secured claims, something the Debtors of course have not done because the

Debtors have already sold all the ineligible inventory.[18]

---

[18] With regard to in-transit inventory specifically, to which the bankruptcy court assigned no value just as it did for all categories of ineligible inventory, the bankruptcy court was of the view that Tiger had valued that inventory at only "between 10 and 30 percent." A-4793 (233:8-11). The court was mistaken.  The Tiger appraisal stated that in-transit inventory "would represent additional recoveries above the net recoveries exhibited in [Tiger's] analysis," and noted that such inventory would incur "an additional expense for…Customs, Insurance, and Freight (CIF) costs, which would range from 10% to 30% of the cost value, depending on the item." *See* A-3371.  Not only did Tiger never "put a value on inventory in transit of between 10 and 30 percent," when Tiger *did* put specific values on in-transit inventory in a subsequent appraisal, the values ranged from 51.6% to 54.8%, *net of* the 10% to 30% of additional expenses.  *See* A-3545. Moreover, the Debtors' long-time liquidation advisor, Abacus, projected a 90% recovery on that inventory. *See* A-3881 (valuing "Delivered Ocean In-Transit Inventory at Cost" at $40 million, and "Delivered Ocean In-Transit Inventory Gross Recovery" at $36 million, based on January 2019 balances).   Viewing the bankruptcy court's statements in conjunction with the Tiger and Abacus analyses, one is "left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985).

All of this makes common sense.  The distinction between eligible and ineligible inventory was strictly for purposes of assessing the willingness of the First-Lien Lenders to lend against certain collateral.  *See* A-4292-93, 4318 (65:20-66:3, 91:17-19).  It had nothing to do with whether the Debtors could sell that inventory—they did.

The cases the bankruptcy court cited to justify its conclusion demonstrate that it was inappropriate for the court to fail to attribute any value to the ineligible inventory.  In *In re Aerogroup International*, 601 B.R. 571 (Bankr. D. Del. 2019), the court declined to adopt either expert's appraisal of accounts receivable and inventory, but it did not simply attribute no value to that collateral.  *See id.* at 593.  The court instead reached its own conclusion as to fair market value that was supported by the record and was within the range of values asserted by the experts.  *Id.*

The same was the case in *In re M.D. Moody & Sons, Inc.*, 2010 Bankr. LEXIS 5220 (Bankr. M.D. Fla. Mar. 5, 2010), in which the court ascribed total accounts receivable a midpoint value between the book value of the total accounts receivable and the book value of the eligible receivables, reflecting its conclusion that "ineligible receivables are in fact collectible and should count towards fair market value."  *Id.* at *37.

72

In short, this was not a case where, faced with competing valuations, the bankruptcy court performed its own fair market analysis and arrived at a reasonable value explained and supported by the record.  Instead, the bankruptcy court here ascribed absolutely no value to hundreds of millions of dollars in inventory even though the Debtors themselves admitted that inventory had substantial value and the undisputed record established that the Debtors were able to sell the inventory.  The bankruptcy court's refusal to attribute any value to the ineligible inventory is reversible error.  *See In re Lyondell Chem. Co*., 585 B.R. 41, 59 (S.D.N.Y. 2018) (vacating bankruptcy court's valuation where, as here, value ascribed "was not suggested by either party, no support can be discerned for it in the record, and it appears unreasonable").

## B.    Pharmacy Scripts

The bankruptcy court committed legal error in declining to count Scripts as Second-Lien Collateral.

*First*, the Scripts fall within the broad grants of collateral to the Second-Lien Holders pursuant to the plain text of the Second-Lien Holders' security agreement. That agreement granted the Second-Lien Holders security interests in, *inter alia*, all inventory and receivables (as well as in the proceeds thereof), *see* A-3431 (Second Lien Security Agreement § 2.1(f)), which the bankruptcy court correctly ruled includes pharmacy inventory and pharmacy receivables.  *See* A-4805

(245:19-23).  The agreement also granted the Second-Lien Holders a security interest in "all books and records pertaining to the Collateral."  *See* A-3431 (Second Lien Security Agreement § 2.1(f)).  As the bankruptcy court acknowledged, Scripts are "books and records."  They set forth in writing the pharmacy's right to fill the prescription of a customer.  But, while the bankruptcy court accordingly held that the Scripts were thus books and records, it concluded that they were not "books and records pertaining to the collateral."  *See* A-4800 (240:3-13).  That makes no sense.  The Scripts plainly pertain to the ***pharmacy*** collateral—*i.e.*, to the pharmacy inventory and receivables.

Indeed, Scripts can be viewed as pharmacy receivables (and not merely as books and records pertaining to those receivables).  The Debtors themselves conceded as much in the Sale Transaction.  *See* A-1558 (APA § 1.1), Definitions (defining "Pharmacy Receivables" as "including, for the avoidance of doubt…pharmacy scripts"); *see also* A-1475-77 (Sale Order) (defining "Pharmacy Collateral" to include pharmacy scripts).

*Second*, the bankruptcy court further erred in concluding that it would ascribe a steeply discounted liquidation value to the Scripts if it had concluded the Scripts were Second-Lien Collateral.  Even though the Debtors' own records, produced in discovery, valued the Scripts on the Petition Date at $72.8 million, the bankruptcy court valued the Scripts at 38.1% of that amount, based on a pre-

bankruptcy liquidation analysis done for the first-lien holders.  A-4798 (238:13-22).  But the court ignored a later version of that same report, which showed the much higher values for the Scripts on which the Debtors relied to satisfy their delivery obligations to Transform under the APA.  *See* A-2877-78 (Schulte Declaration).  More fundamentally, as with the other elements of its valuation, the bankruptcy court's decision to apply liquidation value to the Scripts violated the Supreme Court's holding in *Rash* that collateral that a debtor retains and uses must be valued at its replacement cost, not at its liquidation value.

### C.    First-Lien Post-Petition Interest

The bankruptcy court also erred by deducting a hypothetical $34 million of **post-petition** interest payments to the first-lien creditors from the value of the Second-Lien Collateral on **the Petition Date**.  A-4801-02 (241:15-242:17).  As the bankruptcy court acknowledged, *see* A-4805 (245:2-9), the legal question was what the Second-Lien Holders' interest in the collateral was worth on the Petition Date, not what it might be worth on some hypothetical date in the future if the senior, First-Lien Debt had not been paid by then and had continued to accrue interest after the Petition Date.  Indeed, the whole point of the grant of adequate protection to the Second-Lien Holders—the whole point as a matter of law of any grant of adequate protection in bankruptcy—is to protect a secured party against any diminution in its secured claim from and after the date the debtor files for

bankruptcy.  *See In re Rupprect*, 161 B.R. 48, 49 (Bankr. D. Neb. 1993) (junior

creditor entitled to adequate protection for accrual of post-petition interest to senior

creditor); 4 *Collier on Bankruptcy* § 506.04 (16th ed. 2009).  By deducting post-

petition interest that might have accrued after the Petition Date from the value of

the Second-Lien Collateral on the Petition Date, the bankruptcy court vitiated the

adequate protection it had granted to the Second-Lien Holders on the Petition Date,

in violation of bankruptcy law.  *See* A-460-62 (Final DIP Order ¶ 17(d)) (granting

adequate protection liens to the Second-Lien Holders to protect against diminution

in value and making such adequate protection liens effective *nunc pro tunc* to the

Petition Date).

### D.    Credit Card Accounts Receivable

The bankruptcy court likewise erred in adopting the Debtors' position that

the credit card receivables should be valued at only 85% of their Borrowing Base

amount, rather than at book value.  The credit card receivables were owed to Sears

by major credit card companies, rather than by consumers.   Accordingly, there

was no reason to think they would not be collectible in full.  "Rapid payment" is

"one of the primary purposes" retailers like Sears accept payment by credit card.

Eldon H. Reiley, *Credit cards and credit card receivables defined*, 2 Sec. Interests

in Pers. Prop. § 32:2 (2018 Westlaw).  Reflecting this reality, Sears' audited

financial statements treated the credit card receivables as "cash and cash equivalents," valuing them at their face amounts.  A-3659 (Form 10-K).

The bankruptcy court disregarded this uncontroverted evidence and instead—without explanation—adopted the Debtors' asserted value of $46.6 million.  In so ruling, the court ignored its own prior decision: the basis for the discount from their face amount that the Debtors proposed in valuing the credit card receivables was the same 15% reduction that the Debtors proposed to apply, in light of the supposed valuations embodied in the APA, to all the inventory and receivables, *see* A-1838 (Griffith Declaration, Ex. A)—a reduction the bankruptcy court itself had already rejected as lacking any evidentiary basis.

### E.    Cash

Finally, the bankruptcy court also erred as a matter of law in failing to include any of the cash the Debtors held on the Petition Date when valuing the Second-Lien Collateral.  *First*, under the parties' security agreement, the Debtors had granted the Second-Lien Holders a security interest not merely in all inventory and receivables, but also in all "proceeds" of that and other collateral.[19]  There was

---

[19] The security agreement includes all "Proceeds" of each of the enumerated categories of collateral such as inventory.  *See* A-3431 (Second Lien Security Agreement § 2.1(g)).  It defines "<u>Proceeds</u>" in accordance with the New York Uniform Commercial Code to mean "[w]hatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral."  N.Y. U.C.C. Law § 9-102(a)(64)(A).

no evidence in the record that the cash Sears held on the Petition Date constituted anything *other* than the proceeds of this collateral. To the contrary, the Debtors' own witness conceded that he was not aware of any other source for the Petition Date cash other than the inventory and receivables. *See* A-4213-14 (78:19-79:4).

*Second*, even if some of the cash could somehow not have been Second-Lien Collateral, it certainly was collateral for the First-Lien Debt. *See* A-2886 (Schulte Report). Given the liquid nature of cash, it was appropriate to conclude, as Schulte, A-4288 (61:12-17), and Henrich, A-3075 (Henrich Declaration ¶ 34 n.4), testified, that the Debtors' cash would have first been applied to satisfy the Debtors' first-lien obligations, reducing dollar-for-dollar the amount of senior debt ahead of the Second-Lien Debt. In fact, the agreement for the debtor-in-possession financing (the "DIP Agreement"), as approved by the bankruptcy court, required the Debtors to use the cash the Debtors received to pay down all first-lien advances. A-602 (DIP Agreement § 2.11(c)) (requiring the Debtors to repay the loan advances in the amount equal to any "Net Proceeds").[20] To the end, the DIP

---

[20] The bankruptcy court erroneously suggested that this language applied only to cash generated by Sears after the Petition Date, not to the cash Sears held on the Petition Date. *See* A-4590 (30:1-19). That was simply wrong. The DIP Agreement defined the "collateral," as of the Petition Date, as "***all property*** . . ., ***now owned or hereafter acquired***, upon which a Lien is purported to be created by any Security Document, including the Prepetition ABL Collateral and all other assets of the Loan Parties." *See* A-546 (Final DIP Order § 1.01) (emphasis added).

Agreement required the Debtors to make daily (or at least periodic) transfers of all

amounts on deposit in a checking, savings or other demand deposit account into a

deposit account controlled by Bank of America, as administrative agent for the

first-lien debtor-in-possession financing.  *See* A-641 (Final DIP Order

§ 6.01(m)(ii)).  This cash sweep ensured that all cash of the Debtors would first be

used to pay down the senior, First-Lien Debt, thereby reducing the senior debt

ahead of the Second-Lien Holders.

In short, the cash that Sears held on the Petition Date was Second-Lien

Collateral and, even if it was not, the Second-Lien Holders would have obtained

the benefit of it because Sears had to apply it to pay down the First-Lien Debt,

reducing the debt ahead of the Second-Lien Holders.  The bankruptcy court thus

erred in deducting all of this cash, as if it were entirely unencumbered, in valuing

the Second-Lien Collateral on the Petition Date.

## V.   THE BANKRUPTCY COURT ERRED IN RULING THAT THE PLAIN TEXT OF THE APA CREATES A $50 MILLION CAP ON ESL'S RECOVERY ON ACCOUNT OF ITS CLAIMS UNDER SECTION 507(B) OF THE BANKRUPTCY CODE[21]

The bankruptcy court also deprived ESL of the benefits of its bargain by

misreading the plain text of the APA to reach the conclusion that there is a $50

million absolute cap (the "Cap") on the total amount ESL is permitted to recover

---

[21] Wilmington Trust and Cyrus take no position with respect to this issue.

on its Section 507(b) Claims.  A-4805 (245:10-19).  Delaware law governs the

APA[22] and "Delaware law adheres to the objective theory of contracts, *i.e.*, a

contract's construction should be that which would be understood by an objective,

reasonable third party."  *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014)

(citation omitted).  When a "contract is clear and unambiguous," the court "will

give effect to the plain-meaning of the contract's terms and provisions," *Osborn ex*

*rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010), with "priority to the

parties' intentions as reflected in the four corners of the agreement, construing the

agreement as a whole and giving effect to all its provisions," *Salamone*, 106 A.3d

at 368 (internal quotation marks and citation omitted).

The plain text of the APA is clear and controlling here.  If the sophisticated

parties to the APA had intended to cap any ESL Section 507(b) Claims at $50

million from any and all possible sources of recovery, they would have written

simple contract language to that effect.  They did not.

Section 9.13(c) of the APA grants ESL the right to assert "Claims and

causes of actions that it may have against the Debtors and their estates in the

Chapter 11 Cases," including "Claims arising under Section 507(b) of the

Bankruptcy Code."  The APA includes only two specified limitations on this

---

[22] *See* A-1642 (APA § 13.8(a)).

absolute right.  First, clause (i) provides a carve-out for the proceeds of litigation

claims against ESL and its affiliates for intentional misconduct (the "Specified

Causes of Action"):

> [N]o Claims or causes of action of ESL shall have recourse to, or any
> other right of recovery from . . . any Claim or cause of action involving
> any intentional misconduct by ESL, or the proceeds of any of the
> foregoing[.]

A-1628-29 (APA § 9.13).  Second, clause (ii) provides that:

> [A]ny ESL Claims arising under Section 507(b) of the Bankruptcy
> Code shall be entitled to distributions of not more than $50 million *from
> the proceeds of any Claims or causes of action of the Debtors or their
> estates other than the Claims and causes of action described in the
> preceding clause*.

*Id.* (emphasis added).

Taken together, ESL's recoveries for its allowed Section 507(b) Claims are

limited in two separate ways.  *First*, ESL cannot recover the proceeds of any

distributions to the estates from the Specified Causes of Action—*i.e.*, the Debtors'

claims against ESL itself for intentional misconduct.  *Second*, ESL's recoveries

from the proceeds from *other* causes of action held by the Debtors—the non-ESL

litigation—are limited to the $50 million Cap.  Nothing in either provision limits

ESL's right to recover, up to the full amount of whatever Section 507(b) Claims it

is ultimately determined to have, from any other sources of recovery, including

from Sears assets that are not litigation claims and causes of action.

81

The bankruptcy court reached its contrary conclusion based on its interpretation of the APA's definition of "Claim," which the bankruptcy court labeled "very broad." A-4805 (245:10-19). But that definition, taken from the Bankruptcy Code, makes no reference to the proceeds of inventory, receivables or other hard assets, and instead refers merely to "rights to payment, whether or not such right is reduced to judgment . . . [or is] disputed," A-1540 (APA § 1.1), intimating that it is referencing a claim asserted in a legal proceeding.

Moreover, the bankruptcy court's reading of clause (ii) of the APA would render the second half of the provision superfluous. In particular, if the Cap were intended to apply to all assets of all kind, and not merely to litigation claims or causes of action, it would have been sufficient simply to provide that "any ESL Claims arising under Section 507(b) of the Bankruptcy Code shall be entitled to distributions of not more than $50 million;" there would have been no reason to add the words that follow in clause (ii)—"from the proceeds of any Claims or causes of action of the Debtors or their estates other than the Claims and causes of action described in the preceding clause." The bankruptcy court's reading gives these words no meaning, in violation of the rule that courts must "give[] each provision and term effect, so as not to render any part of the contract mere surplusage." *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) (citations omitted).

82

But even if the APA's definition of "Claim" renders Section 9.13(c) ambiguous, the available parol evidence resolves the ambiguity in ESL's favor. *First*, the Debtors' own contemporaneous statements during the drafting of the APA support ESL's interpretation of clause (ii).  At the auction on January 15, 2019, the Debtors' counsel emphasized that "even after the purchase of all these assets, there was no[] waiver of 507(b) claim and other claims in the estate after the purchasing the assets," which he explained would leave ESL "with very significant claims that . . . would still threaten to take recoveries."  A-4161 (61:9-17).  If the parties had intended the Cap to limit all of ESL's Section 507(b) recoveries from any source to $50 million, the Debtors' counsel would surely not have said this.  Moreover, during the same auction, ESL's counsel set forth his understanding that "ESL's recovery on account of 507(b) claims from the proceeds of other litigation would be capped at 50 million dollars," A-4164 (74:4-25), and the Debtors' counsel did not interject that the Cap applied more broadly to limit ESL's recovery from non-litigation sources also to $50 million.  In short, there is no indication that any party during negotiations understood the APA to cap all of ESL's potential recoveries for its Section 507(b) Claims at $50 million.

*Second*, the Debtors themselves never asserted below that the definition of "Claim" in the APA meant that ESL's recovery on its Section 507(b) Claims would be limited from all sources to $50 million.  While the Debtors argued for

83

such a limitation, they never advanced the reading of the term "Claim" that the bankruptcy court *sua sponte* accepted.

*Finally*, ESL's interpretation of the APA simply makes the most sense in the context of this bankruptcy proceeding and the Sale Transaction in particular.  *See Aleynikov v. Goldman Sachs Group, Inc.*, 765 F.3d 350, 362 (3d Cir. 2014) ("In looking at extrinsic evidence to interpret an ambiguous contractual provision, 'a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing.'" (citation omitted)).  Litigation claims are commonly viewed as special assets for unsecured creditors.  In this case, for example, the Debtors' recently confirmed plan of liquidation provides for the creation of a trust to pursue litigation against various parties (including ESL), for the potential benefit of the unsecured creditors and with counsel for the UCC to take the lead in pursuing that litigation.  A-3303-08 (Plan, §§ 10.3-10.7).  In contrast, hard assets like inventory and receivables are, as in this case, commonly granted as collateral for secured claims.

## CONCLUSION

The Second-Lien Holders respectfully request that the 507(b) Order be reversed and the case remanded to the bankruptcy court for further proceedings.

Dated:      New York, New York
            November 1, 2019

                        Respectfully submitted,

                        CLEARY GOTTLIEB STEEN & HAMILTON
                        LLP

                        By:   /s/ Thomas J. Moloney
                              Thomas J. Moloney
                              Sean A. O'Neal
                              Andrew Weaver
                              Katherine R. Lynch
                              Chelsey Rosenbloom

                              One Liberty Plaza
                              New York, NY 10006
                              Telephone:  (212) 225-2000
                              Facsimile:  (212) 225-3999

                        WILMER CUTLER PICKERING HALE AND
                        DORR LLP

                        By:   /s/ Philip D. Anker
                              Philip D. Anker

                              7 World Trade Center
                              250 Greenwich Street
                              New York, NY 10007
                              Telephone:  (212) 230-8800
                              Facsimile:  (212) 230-8888

                              *Attorneys for ESL Investments, Inc., JPP,
                              LLC, and JPP II, LLC*

MILBANK LLP

By:  /s/ Thomas R. Kreller
        Eric R. Reimer (admitted *pro hac vice*)
        Thomas R. Kreller (admitted *pro hac vice*)
        Robert J. Liubicic

        2029 Century Park East, 33rd Floor
        Los Angeles, California 90067
        Telephone:  (424) 386-4000
        Facsimile:  (231) 629-5063

        *Attorneys for Cyrus Capital Partners, L.P.*


SEYFARTH SHAW LLP

By:  /s/ Edward M. Fox
        Edward M. Fox
        Steven Paradise
        Owen Wolfe

        620 Eighth Avenue
        New York, NY 10018
        Telephone:  (212) 218-4646
        Facsimile:  (917) 344-1339

        *Attorneys for Wilmington Trust, National*
        *Association, as indenture trustee and*
        *collateral agent*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i) and the Court's October 30, 2019 Order granting the Second-Lien Holders' Motion for Leave to File Excess Pages, because it contains 19,435 words, excluding the parts of the brief exempted by Federal Rule of Bankruptcy Procedure 8015(g).

2.      This brief complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  November 1, 2019


By:   /s/ Thomas R. Kreller
        Thomas R. Kreller

## ADDENDUM

## VALUATION COMPARISON CHART

| | Judge Drain | Murray (Cyrus) | Griffith (Debtors) | Henrich (Wilmington Trust) | Schulte (ESL) |
|---|---|---|---|---|---|
| Inventory Valuation Approach | Applied 87.4% recovery to net eligible inventory of $2,391.5. Did not ascribe any value to ineligible inventory on the borrowing base certificate. | Applied 88.7% recovery to net eligible inventory of $2,391.5. Valued in-transit inventory of $144.6 (a component of ineligible inventory) at 51.6%. | Applied 85% to total stock ledger inventory of $2,690.8 on the borrowing base, which included ineligible inventory. | Applied 29% markup to book value of Go-Forward inventory minus 23.4% of costs. Applied 96.4% to book value of GOB inventory. Applied 100% recovery to book value of Sears Home Services inventory. | Applied 100% recovery to $2,073.6 of Go-Forward Stores inventory. Applied 95.6% recovery to $617.2 of GOB stores inventory. |
| **Inventory Value** | $ 2,090.2 | $ 2,195.9 | $ 2,287.2 | $ 3,011.4 | $ 2,663.6 |
| Cash | - | 123.2 | - | 116.2 | 115.5 |
| Credit card receivables | 46.6 | 54.8 | 46.6 | 64.3 | 64.2 |
| Pharmacy accounts receivable | 10.5 | 10.5 | - | 14.5 | 11.9 |
| Pharmacy scripts | - | 72.8 | - | 72.8 | 72.8 |
| Corporate expenses and 506(c) prof. fees | | | | (208.1) | |
| **Collateral Value** | $ 2,147.3 | $ 2,457.1 | $ 2,333.8 | $ 3,071.1 | $ 2,928.1 |
| ABL Revolving Facility | $ 836.0 | $ 836.0 | $ 836.0 | $ 836.0 | $ 836.0 |
| ABL L/C Facility | 123.8 | - | 123.8 | - | - |
| First Lien Term Loan B | 570.8 | 570.8 | 570.8 | 570.8 | 570.8 |
| FILO Term Loan | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 |
| Stand-Alone L/C Facility | 271.1 | - | 271.1 | - | - |
| Accrued postpetition interest | 34.0 | - | 34.0 | - | - |
| **First Lien Debt** | $ 1,960.7 | $ 1,531.8 | $ 1,960.7 | $ 1,531.8 | $ 1,531.8 |
| **Value Available to 2L on Petition Date** | $ 186.6 | $ 925.3 | $ 373.1 | $ 1,539.3 | $ 1,396.3 |
| | | | | | |
| **507(b) Calculation:** | | | | | |
| Lower of 2L Face & Value Avail. to 2L | $ 186.6 | $ 925.3 | $ 373.1 | $ 1,151.5 | $ 1,151.5 |
| Less: value of 2L adequate protection | (0.3) | (0.3) | - | - | - |
| Less: credit bid | (433.5) | (433.5) | (433.5) | (433.5) | (433.5) |
| **507(b) Claim** | $ (247.2) | $ 491.5 | $ (60.4) | $ 718.0 | $ 718.0 |

Add. 1

# STATUTES AND REGULATIONS

**11 U.S.C. § 506**

**(a)**

> **(1)**  An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

> **(2)**  If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

**(b)**  To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

**(c)**  The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

**(d)**  To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless—

> **(1)**  such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

Add. 2

**(2)** such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

## 11 U.S.C. § 507(b)

(b)  If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(2) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.